134 F.3d 133
 In re: GENERAL MOTORS CORPORATION PICK-UP TRUCK FUEL TANK
PRODUCTS LIABILITY LITIGATION
Jack French, Robert M. West, Charles E. Merrit and Gary
Blades (The French objectors/movants), Appellants
in No. 96-2039,
Jesus Garibay, Jerome Hope, Jr., Robert and Lucille White,
and Carlos Zabala, pending intervenors, objectors
and class members, Appellants in No. 96-2054,
Dan Tureck and Joseph Geller, Appellants in No. 96-2061.
 Nos. 96-2039, 96-2054 and 96-2061.
 United States Court of Appeals,
Third Circuit.
 Argued July 25, 1997.
Decided Jan. 14, 1998.
 
 Paul Benton Weeks, III (argued), Wichita, KS, Michael W. Hanna, Raytown, MO, Randall E. Fisher, (argued), Wichita, KS, for Jack French, Robert West, Charles E. Merritt and Gary Blades.
 Robert B. Gerard, (argued) Gerard & Associates, San Diego, CA, Jeffrey A. Miller, Dummit, Faber & Briegleb, San Diego, CA, Clyde C. Greco, Jr., Scott A. Johnson, Greco & Traficante, San Diego, CA, E. David Chanin, Tannebaum & Chanin, Philadelphia, PA, for Jesus Garibay, Jerome Hope, Jr., Robert and Lucille White and Carlos Zabala.
 Lynde Selden, II (argued), Lynde Selden Chartered, PLC, San Diego, CA, Jack Stolier, Sullivan, Stolier and Daigle, New Orleans, LA, Joe R. McCray, (argued) Law Office of Joe R. McCray, San Francisco, CA, Richard H. Rosenthal, Law Office of Richard H. Rosenthal, Carmel Valley, CA, for Dan Tureck, and Joseph Geller, Appellants.
 Robert J. LaRocca (argued), Dianne M. Nast, Roda and Nast, P.C., Lancaster, PA, Elizabeth J. Cabraser, Lieff, Cabraser, Heimann & Bernstein, L.L.P., San Francisco, CA, for Appellees John Martin, et al.
 Karen N. Walker, Jeffrey A. Rosen (argued), John Gibson Mullan, Antony B. Klapper, Kirkland & Ellis, Washington, DC, Lee A. Schutzman, Edward C. Wolfe, General Motors Corporation, Detroit, MI, Francis P. Burns, III, Lavin, Coleman, Finarelli & Gray, Philadelphia, PA, for Appellee General Motors Corporation.
 Alan M. Mansfield, Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, CA, for Appellee Stone Ridge Agri, Inc.
 Michael G. Crow, Karen L. Wilkins, Adams & Reese, New Orleans, LA, for Appellee Edsel Fisher.
 Before: BECKER, MANSMANN, Circuit Judges, and HOEVELER, District Judge.*
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 This is a sequel to our opinion in In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55 F.3d 768 (3d Cir.), cert. denied sub nom. General Motors Corp. v. French, 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995) [hereinafter GM I ], in which we held that the District Court for the Eastern District of Pennsylvania had erred in certifying a nationwide settlement class of General Motors ("GM") truck owners who sought damages and injunctive relief as the result of the allegedly defective design of the fuel system in certain GM Trucks, which is said to have created a high risk of fire following side collisions. The Eastern District of Pennsylvania litigation was made up of a large number of cases transferred to that court by the Judicial Panel on Multidistrict Litigation ("JPML") pursuant to 28 U.S.C. § 1407 for consolidated pretrial proceedings (the "MDL cases"). In GM I, we vacated the class certification order and set aside the settlement but left open the possibility that the defect in the certification procedure might be cured, the class certified, and a revised settlement approved on remand. However, instead of proceeding further in the Eastern District of Pennsylvania, the parties to the settlement repaired to the 18th Judicial District for the Parish of Iberville, Louisiana, where a similar suit had been pending, restructured their deal, and submitted it to the Louisiana court, which ultimately approved it.
 
 
 2
 The action before us is an appeal from an order of the district court denying emergency applications by a number of GM truck owners who were members of the Eastern District of Pennsylvania class for an injunction against further class action proceedings in the Louisiana case, White v. General Motors Corp., No. 42,865 Division "D" (18th Judicial District, Louisiana). At the time of the district court's order, the Louisiana state court was considering whether to approve a settlement between GM and a certified settlement class of GM pickup truck owners, though it stayed entry of its final order until the district court could rule on the request for injunction.
 
 
 3
 The Louisiana settlement class is composed of persons who purchased over a fifteen-year period certain mid- and full-size GM pickup trucks with model C, K, R, or V chassis with fuel tanks located outside the frame rails. Like the federal plaintiffs, the Louisiana plaintiffs allege that the fuel system design leads to an increased risk of fire following side collisions. Appellants are members of that settlement class, and none of them has chosen to opt out of that class.
 
 
 4
 Following the conditional certification of the settlement class by the Louisiana court, the present appellants, truck owners who were never parties but were successful objectors to the proposed Eastern District of Pennsylvania settlement, moved to intervene in the on-going proceedings in the MDL cases and requested the court to enjoin the Louisiana state court from considering the settlement agreement before it. The district court, which at that time had 277 plaintiffs with cases pending before it, denied appellants' motion for intervention as untimely, and also denied the motion for injunctive relief. Appellants then filed Emergency Motions with this Court requesting injunctions against the Louisiana court proceedings. We denied those motions and ordered full briefing. Thereafter, the Louisiana state court entered final judgment approving the settlement. The present appellants also filed notices of appeal from that judgment in the Louisiana appellate system, so that they were proceeding simultaneously with their appeal from the district court's denial of their motion for injunction and their Louisiana appeal.
 
 
 5
 Appellants' claim centers on their argument that the Louisiana settlement is little changed from the one previously rejected by us in GM I. Accordingly, they view the settlement as an "end run" around, and a flagrant violation of, the jurisdiction of the Eastern District of Pennsylvania MDL court to which we had remanded the case for further proceedings. Although the procedure followed by appellees gives us pause, the precedent of this Court and the Supreme Court compels us to disagree with appellants and to affirm the district court's decision on several grounds.
 
 
 6
 Because the attempt to enjoin the Louisiana court proceedings is functionally an attempt to enjoin the individual plaintiffs and class members from proceeding there, we analyze it in those terms. Viewed from that perspective, neither the district court nor this Court has personal jurisdiction over the almost 5.7 million absentee plaintiffs who are (1) not before the district court, (2) have no minimum contacts with Pennsylvania, and (3) have not consented to personal jurisdiction. Second, now that the Louisiana court has entered a final judgment on the settlement, our review is barred by both the Full Faith and Credit Act and the Rooker-Feldman doctrine, which prevents intermediate federal appellate review of state court decisions. Finally, appellants' requested injunction does not fall under any of the three exceptions to the Anti-Injunction Act, which authorize a federal court to stay state court proceedings only when "expressly authorized by an Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283.
 
 I. FACTS AND PROCEDURAL HISTORY
 A. The MDL Proceedings
 
 7
 Although the background facts have been set forth in greater detail in our first opinion in this case, see GM I, 55 F.3d at 779-83, we rescribe those facts necessary to our present decision. Between 1973 and 1991, GM sold over 6.3 million pickup trucks with fuel tanks mounted outside of the frame rails. These trucks are allegedly defective because they are subject to an increased risk of fire in the event of a side collision. In late October 1992, counsel filed claims on behalf of plaintiffs in 26 federal courts and 11 state courts, including Louisiana. On February 26, 1993, the JPML transferred all related federal actions to the District Court for the Eastern District of Pennsylvania for coordinated discovery and pre-trial proceedings pursuant to 28 U.S.C. § 1407.
 
 
 8
 On March 5, 1993, pursuant to an order of the transferee judge, plaintiffs filed a Consolidated Amended Class Action Complaint with 277 named plaintiffs seeking equitable relief and damages. Specifically, the complaint alleged violations of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301 et seq., the Lanham Trademark Act, 15 U.S.C.s 1125(a), as well as a variety of state common law claims including negligence, strict liability, fraud, unfair practices, and breach of written and implied warranty.
 
 
 9
 Also on March 5, 1993, plaintiffs filed a consolidated motion for nationwide class certification. The district court set July 19, 1993, as the date for the hearing on this motion. Discovery proceeded, focusing on the certification issue, while the parties began exploring the possibility of settlement. By the date of the hearing, the parties had reached a settlement in principle and petitioned the court for approval. Without prejudice to GM's opposition to class certification, the parties agreed to certification of a settlement class of GM pickup truck owners.
 
 
 10
 While the provisional settlement included many detailed terms, the most important term provided for a coupon with limited transferability and redeemability provisions. Basically, class members would receive a $1,000 coupon, redeemable toward the purchase of any new GMC truck or Chevrolet light duty truck for a fifteen month period. Under its terms, the approved settlement would have had no effect on any accrued or future claims for personal injury or death, and would not have affected the rights of class members to participate in any future remedial action that might be required by the National Traffic and Motor Safety Act of 1966, 15 U.S.C. §§ 1381 et seq.
 
 
 11
 The district court reviewed the substantive terms of the settlement, and on July 20, 1993, preliminarily determined that the settlement was reasonable. The court also provisionally certified the class of GM truck owners as a settlement class pursuant to Fed.R.Civ.P. 23(b)(3). The class included all persons and entities (except for residents of the State of Texas) who had purchased in the United States and were owners as of July 19, 1993, of (1) a 1973-1986 model year GM full-size pickup truck or chassis cab of the "C" or "K" series; or (2) a 1987-1991 model year GM full-size or chassis cab of the "R" or "V" series.
 
 
 12
 In response to the notices mailed to almost 5.7 million registered truck owners and published nationally, over 5,200 truck owners elected to opt out of the class, and approximately 6,500 truck owners objected to the settlement. On October 26, 1993, the district court held a fairness hearing and approved the settlement as fair, reasonable, and adequate. See In re General Motors, 846 F.Supp. 330 (E.D.Pa.1993).
 
 
 13
 The objectors appealed, and we reversed. See GM I, 55 F.3d at 768. We held that settlement classes must satisfy the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy of representation, as well as the relevant (b)(3) requirements to the same extent as litigation classes, and that the district court must make findings to that effect. See id. We also held that a finding that the settlement was "fair and reasonable", which was all that the district court had made, was not a surrogate for the Rule 23 class findings. See id. Then, identifying potential problems with meeting the commonality, typicality, and predominance requirements, we vacated the orders that had certified the settlement class and had approved the settlement, and remanded the case for further proceedings.
 
 
 14
 Following remand, plaintiffs amended their complaint, filed a renewed motion for class certification, and proceeded with discovery pursuant to our opinion. Prior to the order giving rise to this appeal, the litigation in the district court had been proceeding in accordance with Pretrial Order No. 12, issued on April 4, 1996, allowing for supplemental discovery relating to class certification, liability, and damages. There are approximately 277 named plaintiffs left in the MDL case, none of whom are appellants here. Moreover, according to the district court, no settlement is pending, and the motion for class certification is not yet ripe. See In re General Motors Corp. Pickup Truck Fuel Tank Prod. Liab. Litig., 1996 WL 683785, * 2 (E.D.Pa.) [hereinafter GM II ].
 
 B. The Louisiana Proceedings
 
 15
 In addition to the litigation that had been consolidated and was progressing in the district court, plaintiffs had concurrently filed actions in 11 state courts, including Louisiana. The Louisiana action was filed on February 11, 1993. On May 18, 1993, a Louisiana trial court granted plaintiffs' motion for class certification of a statewide class as the basis for litigation. This decision was stayed by a Louisiana appellate court on August 8, 1993, based upon the preliminary nationwide settlement reached in the Eastern District of Pennsylvania MDL cases.
 
 
 16
 After we vacated the order creating the settlement class, a new round of negotiations between Louisiana class counsel and GM began. On June 27, 1996, these negotiations came to fruition. The parties filed their new provisional settlement agreement in the 18th District Court for the Parish of Iberville, where the statewide litigation class had previously been certified. The Louisiana court preliminarily approved the new settlement and provisionally certified a nationwide class. The court ordered individual notices disseminated to the 5.7 million class members, scheduled a formal fairness hearing for November 6, 1996, and requested objections and notices of exclusions. 200 of the 277 plaintiffs in the federal MDL successfully moved to intervene in the Louisiana proceedings.
 
 
 17
 The new Louisiana settlement, while similar in content to the original settlement provisionally approved by the MDL court in 1993 and later rejected by this Court, differs in several ways, all responsive to our comments in GM I about perceived problems with the earlier settlement. First, the Louisiana settlement extends the period during which class members could validly redeem their $1,000 coupons (from 15 to 33 months for consumers and from 15 to 50 months for fleet and government owners). Second, the settlement provides for greater transferability of the coupons. Third, the settlement would allow class members to apply the coupon value toward the purchase of any GM vehicle (except Saturn automobiles), rather than just GM pickup trucks. Fourth, the settlement stipulates that GM and plaintiffs' counsel will fund two new safety programs, researching the safety of general fuel systems and testing proposed retrofits for safety and feasibility, purported to be worth a combined $5.1 million. Fifth, commitments have apparently been made by a major bank to purchase the transferable coupons, thereby creating a secondary market.
 
 
 18
 Appellants and appellees strongly dispute the viability and significance of the differences between the two settlements. Appellees contend that these changes satisfy most, if not all, of this Court's problems with the original agreement. They note significantly that all the governmental and fleet entities, as well as the Public Citizen Litigation Group and the Center for Auto Safety, which objected to the original settlement, support the Louisiana settlement. Appellants, conversely, assert that class counsel and GM have essentially repackaged the agreement that had been rejected in Philadelphia, made purely cosmetic changes, and have run off to Louisiana for approval.
 
 
 19
 A particular point of contention is the safety programs. Certain appellants attack them as either unhelpful, wasteful, or unnecessary. Appellants Dan Tureck and Joseph Geller, for example, submit that the proposed research programs will, by definition, not involve any of the trucks in this litigation, because they will only investigate the safety of vehicles five years old or less--all of the trucks affected in this litigation were built before 1992. They also contend that the fund may be inadequate or misspent and may not lead to a practical or affordable retrofit. Finally, they argue that GM already has a satisfactory retrofit design--simply placing the fuel tanks inside the frame rails as GM has already done in its Suburban/Blazer configuration, which was built on the same chassis as the trucks at issue here. For the purposes of this appeal however, it is not necessary for us to resolve any of the disputes regarding the true character of the Louisiana settlement.
 
 C. The Motion to Enjoin
 
 20
 On October 18, 1996, objectors Jack French, Robert M. West, Charles E. Merritt, and Gary Blades (the "French objectors") petitioned this Court for a temporary stay, show cause order, and a writ of injunction to stay the proceedings of the Louisiana court. On October 22, 1996, we transferred this application to the district court pursuant to 28 U.S.C. § 1631. Dan Tureck and Joseph Geller (the "Tureck objectors"); and Jesus Garibay, Jerome Hope Jr., Robert and Lucille White, and Carlos Zabala (the "Garibay objectors") also moved in the district court to enjoin the Louisiana proceedings. All three sets of objectors later moved to intervene in the MDL.
 
 
 21
 On November 25, 1996, the district court denied the objectors' motions to intervene and their motions for an injunction.[1] Appellants then appealed the district court's decision and moved for an emergency injunction against proceedings in the Louisiana court. We denied appellants' emergency motion without opinion and ordered full briefing. In the meantime, on November 6, 1996, the Louisiana court conducted its fairness hearing. On December 19, 1996, the Louisiana court entered final judgment approving the settlement.
 
 II. PERSONAL JURISDICTION
 
 22
 At the threshold, we must examine our power over the parties. See Carlough v. Amchem Prods., Inc., 10 F.3d 189, 198 (3d Cir.1993) (application of the Anti-Injunction and All-Writs Acts must be preceded by satisfaction of jurisdictional requirements). Appellees assert that the district court had no jurisdiction to enjoin the Louisiana court in the first instance (had it chosen to do so), and thus we can have no jurisdiction to enjoin that court on appeal. This contention is grounded upon appellees' submission that any injunction issued by this Court would affect the nationwide group of 5.7 million people who have already settled their claims with GM through the Louisiana proceedings, and therefore, that any injunction of the Louisiana Court would necessarily enjoin those 5.7 million individual settling class members and would require this Court to exercise personal jurisdiction over them. We agree.
 
 
 23
 The minimum standards of due process require that "in order to subject a defendant to a judgment in personam, if he not be present within the territory of the forum, he must have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (citations omitted). In the Rule 23(b)(3) context, the Supreme Court has held that it is possible for a court to bind an absentee class member to a judgment without abrogating minimal due process protection, even if the party did not have minimum contacts with the forum. See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 812-13, 105 S.Ct. 2965, 2974, 86 L.Ed.2d 628 (1985). But here, in the wake of our judgment in GM I, there is no class pending before the MDL court, and thus, virtually none of the 5.7 million class members in Louisiana are before this Court in any respect, and there is no basis upon which we can infer their consent.[2]
 
 
 24
 To be more precise, the Louisiana class members are not parties before us; they have not constructively or affirmatively consented to personal jurisdiction; and they do not, as far as has been demonstrated, have minimum contacts with Pennsylvania. Therefore, due process deprives us of personal jurisdiction and prevents us from issuing the injunction prayed for by appellants.
 
 
 25
 III. FULL FAITH AND CREDIT AND THE ROOKER-FELDMAN DOCTRINE.
 
 
 26
 Appellees contend that even if we had personal jurisdiction over the class members certified in Louisiana sufficient to enjoin the Louisiana proceedings, now that the Louisiana court has entered a final judgment, we can no longer simply enjoin the Louisiana court from entering judgment on the provisional settlement. In their submission, we would have to first direct the district court to vacate the Louisiana court's final judgment and then enjoin it from entering any new judgment on the settlement. Appellees contend that both the Full Faith and Credit Act, 28 U.S.C. § 1738, and the Rooker-Feldman doctrine prevent us from vacating the final judgment of the Louisiana court.
 
 A. The Full Faith and Credit Act
 
 27
 28 U.S.C. § 1738 provides in pertinent part:
 
 
 28
 The ... judicial proceedings of any court of any such State, Territory, or Possession ... shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory, or Possession from which they are taken.
 
 
 29
 As interpreted by the Supreme Court, § 1738 "directs all courts to treat a state court judgment with the same respect that it would receive in the courts of the rendering state." Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 373, 116 S.Ct. 873, 877, 134 L.Ed.2d 6 (1996). We may not " 'employ [our] own rules ... in determining the effect of state judgments,' but must 'accept the rules chosen by the State from which the judgment is taken.' " Id. (citing Kremer v. Chemical Const. Corp., 456 U.S. 461, 481-82, 102 S.Ct. 1883, 1898, 72 L.Ed.2d 262 (1982)); see also In re Glenn W. Turner Enterprises Litig., 521 F.2d 775, 780 (3d Cir.1975) ("absent statutory or constitutional directive, the state and lower federal courts are independent, and ... a federal action is not superior to a state proceeding merely because of its federal character ... judgments resulting from federal actions are not preferred to judgments resulting from state actions because of their federal character").
 
 
 30
 Under Louisiana law, the class action settlement that appellants seek to enjoin here is a final judgment. See La.Code Civ. Proc. Ann. art. 1841. Facially, therefore, § 1738 leaves us no choice but to decline appellants' request. This conclusion is confirmed by the Supreme Court's recent decision in Matsushita, at 367, 116 S.Ct. at 873.
 
 
 31
 In Matsushita, the Supreme Court considered whether a class action settlement agreement releasing claims within the exclusive jurisdiction of the federal courts was subject to the usual application of § 1738. The Court held that neither the fact that the judgment was a product of a class action rather than an individual claim, nor the fact that the settlement released claims exclusively within the jurisdiction of the federal courts undermined the applicability that section.[3] See id. at 372-75, 116 S.Ct. at 877-78. As the Court said, "[t]he judgment of a state court in a class action is plainly the product of a 'judicial proceeding' within the meaning of § 1738. Therefore, a judgment entered in a class action, like any other judgment entered in a state judicial proceeding, is presumptively entitled to full faith and credit under the express terms of the Act." Id. at 374, 116 S.Ct. at 878.
 
 
 32
 The final word has yet to be written in (or about) Matsushita. Justice Ginsburg's dissent identified serious potential due process problems in the procedures followed in the Delaware state court (where the settlement was approved) as they are used to justify nationwide application of full faith and credit. See id. at 394-99, 116 S.Ct. at 888-90 (Ginsburg, J., dissenting). On remand, a panel of the Ninth Circuit considered the issues raised in the dissent and divided sharply.[4] Further proceedings before an en banc Ninth Circuit, or the Supreme Court in Matsushita may cast light (or doubt) on the viability of the Louisiana judgment here in due process terms. Moreover, the Supreme Court can consider any such problems with the Louisiana settlement on certiorari to the Louisiana court. If appellants are correct, the Court will be disturbed by what Matsushita has wrought here insofar as it is said to have facilitated an end run around the Eastern District of Pennsylvania proceedings.
 
 
 33
 But whatever may be the ramifications of Matsushita, the present appellants are members of the Louisiana class who did not exercise their opt out rights. They are active participants in the settlement approval process there, and have timely appealed the adverse judgment there as well. Especially under these circumstances, the Full Faith and Credit Act prevents this Court from vacating the now final judgment of the Louisiana court.
 
 B. The Rooker-Feldman Doctrine
 
 34
 Under the Rooker-Feldman doctrine, "federal district courts lack subject matter jurisdiction to review final adjudications of a state's highest court or to evaluate constitutional claims that are 'inextricably intertwined with the state court's [decision] in a judicial proceeding.' " Blake v. Papadakos, 953 F.2d 68, 71 (3d Cir.1992) (quoting District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 483 n. 16, 103 S.Ct. 1303, 1315 n. 16, 75 L.Ed.2d 206, (1983)); see also Rooker v. Fidelity Trust Co., 263 U.S. 413, 416, 44 S.Ct. 149, 150, 68 L.Ed. 362, (1923). The concerns that underlie the doctrine are respect for the state courts and concerns over finality of judgments. See Guarino v. Larsen, 11 F.3d 1151, 1156-57 (3d Cir.1993). District courts lack subject matter jurisdiction once a state court has adjudicated an issue because Congress has conferred only original jurisdiction, not appellate jurisdiction, on the district courts. See Rooker, 263 U.S. at 416, 44 S.Ct. at 150. We have interpreted the doctrine to encompass final decisions of lower state courts. See FOCUS v. Allegheny County Court of Common Pleas, 75 F.3d 834, 840 (3d Cir.1996) (citing Port Auth. Police Benev. Ass'n v. Port Auth., 973 F.2d 169, 178 (3d Cir.1992)).
 
 
 35
 As was discussed supra with respect to the Full Faith and Credit Act, the Louisiana court has entered a valid final judgment. See La.Code Civ. Proc. Ann. art. 1841. The decision by that Court was clearly an adjudicative and not a legislative or ministerial act. See Guarino, 11 F.3d at 1157-58 (setting forth the prerequisites for Rooker-Feldman application); see also Kamilewicz v. Bank of Boston Corp., 92 F.3d 506, 510 (7th Cir.1996) (refusing under the Rooker-Feldman doctrine to overturn a state court judgment approving a settlement entered after a fairness hearing). Therefore, in order for us to grant appellants' requested relief, we would first have to "determine that the state court judgment was erroneously entered." FOCUS, 75 F.3d at 840. Rooker-Feldman bars exactly this sort of intermediate appellate review of state court judgments and divests this Court of subject matter jurisdiction of this appeal.
 
 IV. THE ANTI-INJUNCTION ACT
 
 36
 Under the terms of the Anti-Injunction Act, "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. If an injunction falls within one of these three exceptions, the All-Writs Act provides the positive authority for federal courts to issue injunctions of state court proceedings.[5] See Carlough, 10 F.3d at 201 n. 9 (3d Cir.1993) (citing In re Asbestos Sch. Litig., 1991 WL 61156, (E.D.Pa. April 16, 1991), aff'd mem, 950 F.2d 723 (3d Cir.1991)). The two statutes act in concert, and the parallel "necessary in aid of jurisdiction" language is construed similarly. See id. Appellees assert that even assuming that this case was not barred for all of the reasons discussed above, the Anti-Injunction Act would still frustrate appellants' prayers for relief.
 
 
 37
 Our judgment in GM I concerning the requirements that a settlement class must meet under Rule 23, which would have applied in the MDL action on remand had the parties sought to forge a new settlement in the district court, became final when the Supreme Court denied GM's petition for certiorari. See General Motors Corp. v. French, 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995). According to appellants, this precludes all other courts (state and federal) from adopting any other interpretation of class settlement requirements, under either state or federal law. Therefore, they say, under the principles of collateral estoppel and "law of the case", the settlement class issue is insulated from reevaluation in other forums.
 
 
 38
 Translated into a statutory context, appellants argue that this situation falls under an exception to the Anti-Injunction Act, and therefore under the positive force of the All-Writs Act, the district court had the power to enjoin the Louisiana proceedings either "in aid of its jurisdiction" or "to protect and effectuate its judgments". As we will now explain, however, the exceptions to the Anti-Injunction Act are very narrow indeed, and the Act serves as an absolute bar to district court injunctive action here.
 
 
 39
 The Anti-Injunction Act is "an absolute prohibition against enjoining State Court proceedings, unless the injunction falls within one of three specifically defined exceptions." Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Eng'rs, 398 U.S. 281, 286, 90 S.Ct. 1739, 1743, 26 L.Ed.2d 234 (1970); 1975 Salaried Retirement Plan v. Nobers, 968 F.2d 401, 405 (3d Cir.1992). This prohibition applies whether appellants seek to enjoin the parties to the action or the state court itself. See Atlantic Coast, 398 U.S. at 287, 90 S.Ct. at 1743; Nobers, 968 F.2d at 405. Moreover, these three exceptions are to be rigorously construed and "should not be enlarged by loose statutory construction." Atlantic Coast, 398 U.S. at 287, 90 S.Ct. at 1743. "[A] federal court does not have inherent power to ignore the limitations of § 2283 and to enjoin state court proceedings merely because those proceedings interfere with a protected federal right or invade an area preempted by federal law, even when the interference is unmistakably clear." Id. at 294, 90 S.Ct. at 1747.
 
 
 40
 Finally, "[a]ny doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state court to proceed in an orderly fashion to finally determine the controversy." Id. at 297, 90 S.Ct. at 1748. With this background, we now proceed with the relevant exceptions to the Act.[6]
 
 
 41
 A. "Necessary in Aid of Its Jurisdiction"
 
 
 42
 Appellants' primary argument for injunctive relief is that this action falls under the "in aid of its jurisdiction" exception to the Anti-Injunction Act. Appellants argue that because the same attorneys representing the same class of plaintiffs were once pursuing settlement in the Eastern District in the MDL and now, having had their proposed settlement rejected by this Court, are pursuing a similar settlement in Louisiana, they are engaged in forum shopping, evading the dictates of this Court, and ultimately, impeding the federal court's ability to exercise its jurisdiction.
 
 
 43
 First, we note that the "necessary in aid of its jurisdiction" exception applies only "to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case." Atlantic Coast, 398 U.S. at 295, 90 S.Ct. at 1747. No such interference or impairment appears in this record. Indeed, in those cases cited by appellants where a state action has been enjoined, the federal court had already approved or conditionally approved its own settlement or the approval was imminent. That is not the case here. The MDL court is not considering a nationwide settlement pursuant to our remand in GM I. Moreover, the Louisiana settlement contained opt out provisions, thereby protecting the rights of the 277 remaining MDL plaintiffs.
 
 
 44
 We are also constrained by the narrow application the "necessary in aid of its jurisdiction" exception has been given. We noted in Nobers that "the typical application of this exception has been in removal cases (where a district court must ensure its exclusive governance of the particular litigation removed) and in in rem cases (where, under the traditional view, only one court can entertain jurisdiction over a particular res)." 968 F.2d at 407 (footnotes and citations omitted). Neither the removal nor in rem application of this exception is implicated here.
 
 
 45
 In Carlough, this Court fashioned a third, and narrow, application of the "necessary in aid of its jurisdiction" exception in the context of a complex class action which was also an MDL case where a settlement was imminent; where the federal court had already expended considerable time and resources; and where the pending state action threatened to derail the provisional settlement. There, we upheld an injunction that prevented absentee members from seeking a declaratory judgment in state court that would have declared that all putative West Virginia members had opted-out of the federal class. See 10 F.3d at 204. Our holding that the injunction was within the district court's "sound discretion" in Carlough is not applicable here. The state court plaintiffs in Carlough were seeking not merely to litigate the same cause of action in state court, but rather to use the state action as a "preemptive strike" against the federal suit, attempting to have the state court declare what the federal court should and should not do with respect to the federal settlement. See id. at 203.
 
 
 46
 In addition, the state court plaintiffs in Carlough were attempting to effectuate a "mass opting out" of an entire state sub-class of plaintiffs, the result of which would have confused the sub-class members (who would have received simultaneous and inconsistent state and federal class notices), disrupted the federal court's on-going management of the settlement negotiations, and "cause[d] havoc" on the settlement's prospects. See id. at 204. Under these narrow circumstances, we held that an injunction was appropriately within the district court's discretion.
 
 
 47
 Here, none of the Carlough circumstances exist. There is no classwide settlement pending before the district court (indeed, the conditional class certification by the district court no longer subsists), and no stipulation of settlement or prospect of settlement in that court is imminent. Furthermore, it simply cannot be said that the Louisiana court is attempting to dictate to the district court the scope and terms of a settlement, since none is pending before the district court. Finally, there can be no confusion by class members, for only one set of notices has been sent out (from the Louisiana court).
 
 
 48
 In fact, if the settlement is ultimately approved by the Louisiana appellate system (and the United States Supreme Court, if necessary), then the nationwide class will be certified (in Louisiana), and (excepting opt outs) no court will have any plaintiffs left with which to proceed. If disapproved, then the district court (or any other court) can continue with discovery. In short, none of the concerns which animated our narrow application of the "necessary in aid of its jurisdiction" exception to the Anti-Injunction Act in Carlough exist here.
 
 
 49
 B. "To Protect or Effectuate Its Judgments"
 
 
 50
 Appellants alternatively argue that appellees are purposefully attempting to avoid our decision in GM I, 55 F.3d at 768, which vacated the class certification. Under the so-called "relitigation exception" of the Anti-Injunction Act, this is, according to appellants, precisely the sort of situation where an injunction is in order "to protect or effectuate [the] judgments" of this Court. While the district court would have been bound on remand to apply the precepts we announced about the requisites for class certification and the anatomy of the class (including subclassing), appellants nonetheless are incorrect when they attempt to attach res judicata or collateral estoppel effect to our GM I decision in other jurisdictions.
 
 
 51
 In Chick Kam Choo v. Exxon, 486 U.S. 140, 147, 108 S.Ct. 1684, 1690, 100 L.Ed.2d 127 (1988), the Supreme Court held that:
 
 
 52
 The relitigation exception was designed to permit a federal court to prevent state litigation of an issue that previously was presented to and decided by the federal court. It is founded in the well-recognized concepts of res judicata and collateral estoppel.
 
 
 53
 With this in mind, appellants' contention that our opinion in GM I disapproving the settlement and decertifying the provisional settlement class is a "judgment" that has res judicata or collateral estoppel effect is flawed for several reasons.
 
 
 54
 First, denial of class certification is not a "judgment" for the purposes of the Anti-Injunction Act while the underlying litigation remains pending. See J.R. Clearwater Inc. v. Ashland Chem. Co., 93 F.3d 176, 179 (5th Cir.1996). We endorse the Fifth Circuit's rationale that denial of class certification under these circumstances lacks sufficient finality to be entitled to preclusive effect. Second, the decision by this Court to reject the provisional settlement class is not a "judgment" with respect to the Louisiana settlement agreement, and our interpretation of Rule 23 is not binding on the Louisiana court. All that we did in GM I was hold that the district court had erred in certifying the settlement class without making factual findings to support class certification under Rule 23(a) and (b)(3), and require that certain problems with meeting the Rule 23(a) and (b) requirements be corrected by the MDL court on remand. See GM I, 55 F.3d at 778. We held open the possibility that on remand, settlement "in either [ ] original or a renegotiated form" might later be approved. See id. at 819. Moreover, our construction of Rule 23 and application to the provisional settlement class is not controlling on the Louisiana court, because it is not bound by our interpretation of Rule 23. Rather, the Louisiana court properly applied La.Code Civ. Proc. Ann. arts. 591 and 592, the parallel Louisiana class certification rule.[7]
 
 
 55
 Since appellants have failed to show that an exception to the Anti-Injunction Act under these circumstances was either expressly authorized by Congress, necessary in the aid of the MDL court's jurisdiction, or necessary to protect or effectuate a final judgment of the MDL court, neither this Court nor the district court has the authority to enjoin the Louisiana proceedings.
 
 
 56
 The order of the district court will be affirmed.
 
 
 
 *
 Honorable William M. Hoeveler, United States District Judge for the Southern District of Florida, sitting by designation
 
 
 [1]
 Appellants assign the denial of intervention as error. We review for abuse of discretion, see United States v. Alcan Aluminum, Inc., 25 F.3d 1174, 1179 (3d Cir.1994), and find none. Appellants did not move to intervene until four months after the Louisiana court granted provisional certification of a nationwide class, and almost two months after they received notice of the proposed settlement. Indeed, their motion came just nine days before the Louisiana fairness hearing. According to the district court, appellants offered no explanation as to why they did not intervene earlier or why they did not file in federal court and become a party in the MDL. See GM II, 1996 WL 683785, at * 5. They have similarly offered no explanation to us in their briefs, except for the contention that they had no basis to intervene until they found out that the class counsel had reached a provisional settlement in Louisiana
 We disagree with appellants' contention. They could have intervened as early as July of 1993 after class counsel and GM submitted the first provisional settlement to the district court, to which they interposed such strong (and successful) objection in GM I. Even during the pendency of the appeal, they could have moved for remand to the district court for the purpose of permitting them to intervene. At all events, given the circumstances here (appellants waited two months after receiving notice of the proposed Louisiana settlement to intervene and then formally moved only days before the Louisiana fairness hearing), the district court did not abuse its discretion in denying appellants' motion to intervene.
 The intervention issue is cognate to appellees' claims that appellants lack Article III standing to object because they are not parties to any action presently pending in the Eastern District of Pennsylvania (and because there is no subsisting class in that court). That issue is not free from doubt. Neither is appellees' argument that the subject matter of this appeal is moot because we cannot enjoin the entry of a final judgment by the Louisiana court after it has already been entered. In view of our disposition, however, we decline to address either contention.
 
 
 [2]
 We note that enjoining the few Louisiana class members that the MDL court does have personal jurisdiction over (the 200 named MDL plaintiffs who have successfully intervened in the Louisiana proceeding) would serve no purpose. Barring the other procedural barriers discussed infra, it is conceivable that we could direct the district court to enjoin those 200 plaintiffs from pursuing their state damage remedies in Louisiana. As the district court properly pointed out, however, since the appellants' stated goal here is to prevent the Louisiana court from further consideration of the settlement in toto, little would be accomplished by enjoining only those 200 plaintiffs, see GM II, 1996 WL 683785, at * 6, and we have not been asked to do so. At all events, the limited injunction would not halt the Louisiana proceedings because the original Louisiana plaintiffs (over whom we have no jurisdiction) could simply continue with the settlement
 
 
 [3]
 While Matsushita answered the more difficult (and controversial) question of whether a state court can release exclusive federal claims, see Marcel Kahan & Linda Silberman, Matsushita and Beyond: The Role of State Courts in Class Actions Involving Exclusive Federal Claims, 1996 Sup.Ct. Rev. 219 (1996) (criticizing the Supreme Court's holding in Matsushita arguing that it may undermine some of Congress' reforms in the Private Securities Litigation Reform Act), that issue is not implicated here. The claims settled by GM and the class members in Louisiana included state-based contract and tort claims against GM on behalf of pickup truck owners. The only federal claims arise under the Lanham Trademark Act and the Magnuson-Moss Warranty Act. None of the claims confer exclusive jurisdiction on the federal courts
 
 
 [4]
 The majority held that the Delaware judgment violated the due process rights of the plaintiff class before the federal court (made up of non-objecting, non-opting out Delaware absentee members) because Delaware class counsel could not adequately represent them. See Epstein v. MCA, Inc., 126 F.3d 1235, 1255 (9th Cir.1997). The dissenting judge argued forcefully that the inadequacy question had been fully and fairly litigated in Delaware and finally decided there. See id. at 1256 (O'Scannlain, J., dissenting). Therefore, in his opinion, the Full Faith and Credit Act (as well as the underlying policies of federalism, comity, and finality) barred reconsideration of the Delaware decision by the federal courts
 
 
 [5]
 The All-Writs Act provides: "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their jurisdiction and agreeable to the usages and principles of law." 28 U.S.C. § 1651
 
 
 [6]
 The first exception to the Anti-Injunction Act--"expressly authorized by act of Congress"--was not invoked by the appellants and merits little discussion. The only federal statutes potentially implicated in this case are Fed.R.Civ.P. 23, the Lanham Trademark Act, and the Magnuson-Moss Warranty Act. Neither the Lanham Act nor the Magnuson-Moss Act meets the Mitchum v. Foster test for the "expressly authorized" exception, which requires that a statute clearly create a federal right or remedy that could be given its intended scope only by the stay of a state court proceeding. See Nobers, 968 F.2d at 408 (citing Mitchum v. Foster, 407 U.S. 225, 237-38, 92 S.Ct. 2151, 2159-60, 32 L.Ed.2d 705 (1972)). In addition, Rule 23(b)(3) does not constitute a predicate act of Congress exempting this action from the Anti-Injunction Act. See In re Glenn W. Turner, 521 F.2d at 781 ("Since Rule 23 by its own terms creates a mechanism leaving parties in a b(3) action free to continue with any state proceedings, we cannot hold that a Rule 23(b)(3) class action can 'be given its intended scope only by the stay of a state court proceeding.' "); Carlough, 10 F.3d at 202 (same)
 
 
 [7]
 Under similar circumstances, the Fifth Circuit noted:
 While Texas Rule of Civil Procedure 42 is modeled on Rule 23 of the Federal Rules, and federal decisions are viewed as persuasive authority regarding the construction of the Texas class action rule, a Texas court might well exercise this discretion in a different manner. It is our considered view that the wide discretion inherent in the decision as to whether or not to certify a class dictates that each court--or at least each jurisdiction--be free to make its own determination in this regard. This reasoning is particularly applicable when matters of state-federal relations are involved....
 J.R. Clearwater, 93 F.3d at 180 (citations and footnote omitted).