705 A.2d 784

ARTHUR M. ROSS, PLAINTIFF, v. CAROL LEE ROSS, DEFENDANT–RESPONDENT.

GINA ANN CHILORO, APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued December 15, 1997—Decided January 30, 1998.

Before Judges HAVEY, NEWMAN and COLLESTER.

*Laurence B. Orloff* argued the cause for appellant (*Orloff, Lowenbach, Stifelman & Siegel,* attorneys; *Mr. Orloff,* of counsel; *Mr. Orloff* and *Laura V. Studwell,* on the brief).

*Karin Duchin Haber* argued the cause for respondent (*Haber & Silver,* attorneys; *Ms. Haber,* on the brief).

The opinion of the court was delivered by

NEWMAN, J.A.D.

This appeal involves the impact of the Employee Retirement Income Security Act, 29 *U.S.C.A.* §§ 1001 to –1461, as amended by the Retirement Equity Act, on the disposition of pension assets in a property settlement agreement pursuant to a divorce.

Appellant, Gina Ann Chiloro, appeals from an order of June 4, 1996 by the Family Part entering Qualified Domestic Relations Orders (QDROs) after the death of her husband which authorized the distribution of the proceeds of certain pension plans and annuity contracts to defendant, Carol Lee Ross, former wife of the

decedent. We affirm the distribution of the proceeds of the Work–O–Lite Co., Inc. Money Purchase Pension Plan to Carol Ross. We reverse the distribution of the R & S/CN Trucking Defined Benefit Pension Plan to Carol Ross and direct that it be paid to appellant. We vacate the Qualified Domestic Relations Order entered for the Nationwide Insurance Annuity Contract and remand for further proceedings.

After a twenty-seven-year marriage, plaintiff Arthur Ross and defendant Carol Lee Ross divorced on October 19, 1993. Attached to the judgment of divorce was a property settlement agreement (PSA) entered into by the couple on October 18, 1993 which, among other things, distributed the personal and real property acquired during the marriage. In addition to providing Ms. Ross with one-half of the annuity and pension benefits that Mr. Ross may receive during his lifetime, one section of the PSA purports to entitle Ms. Ross to the full amount of survivor benefits under the pension and annuity plans in the event of Mr. Ross's death. That section (hereafter referred to as Section F) reads in full:

F. Husband's Pensions

1. Wife shall be entitled to receive one-half (1/2) of the Husband's pensions and/or annuities from Work–O–Lite Co., Inc. and National Lighting Co., Inc. The Wife shall receive the survivor annuity of the pension plans, as per the provisions of the plans. It is the intention of the parties that for the purposes of the defined benefit plan and the defined contribution plan, Carol Ross shall be deemed to be the surviving spouse and shall be designated beneficiary for any survivor annuity.

2. In the event that the defined contribution plan is terminated prior to Husband's death, Husband and Wife shall equally split the amount to be received as a result of the termination.

3. Wife shall have prepared, at her expense, Qualified Domestic Relations Orders, to effectuate the division of Husband's pensions and the other provisions of this paragraph relating to Husband's pensions. The Qualified Domestic Relations Orders shall be prepared by a qualified professional acceptable to both parties. Husband shall cooperate in providing all information necessary to allow the preparation of the Qualified Domestic Relations Orders.

During their marriage, Mr. Ross was an officer and shareholder of two closely-held sister companies, Work–O–Lite Co., Inc. and

National Lighting Co., Inc. These companies, which were previously owned by Ms. Ross's father, were conveyed to Mr. and Ms. Ross in equal shares. As a result of his employment by these companies, Mr. Ross acquired substantial pension benefits which are the subject of this lawsuit.

In the final years of his marriage, Mr. Ross lived with Ms. Chiloro rather than his wife. After being diagnosed with terminal cancer, he sought to expedite his divorce from Ms. Ross in order to marry Ms. Chiloro before his death. On November 24, 1993, one month after his divorce and remarriage to Ms. Chiloro, Mr. Ross died.

Upon his death, Mr. Ross owned the following three pension plans: (1) Work–O–Lite Co., Inc. Money Purchase Pension Plan, worth $431,906, (2) R & S Leasing Defined Benefit Plan, worth $17,451, and (3) CN Trucking, Inc. Defined Benefit Plan, worth $24,447. The record below reveals that the second and third plans were merged such that CN Trucking, Inc. became an adopting employer of the R & S Leasing Defined Benefit Plan. Thus, both plans will hereafter be collectively referred to as the R & S/CN plan. Mr. Ross also owned one annuity contract with Nationwide Life Insurance Company, entitled "Nationwide Insurance Annuity," worth $294,780 at his death. Since his death, the proceeds from the pension plans and annuity contract have grown to well over one million dollars.

The pension plans and annuity contract each state that, in the event of the participant's death, the beneficiary of the survivorship payments shall be the Participant's/Annuitant's spouse, unless otherwise agreed to in writing by the spouse. Although the PSA stated that "Carol Ross shall be deemed to be the surviving spouse," Chiloro never agreed in writing to this alienation of her survivorship rights.

On April 24, 1995, Ms. Ross (hereafter, references to "Ross" only are to defendant Carol Ross) requested the Family Court, through an informal letter, to enter QDROs entitling her to the survivor benefits under each of the pension plans and the annuity

contract. The court postponed entry of the QDROs when Mr. Ross's estate objected on the grounds that the QDROs were submitted without the estate's prior review as contemplated by the PSA and because the tax implications of the QDROs were, at that point, unknown.

On April 11, 1996, Ross formally moved before the Family Part for the entry of the QDROs in accordance with Section F of the PSA. Alternatively, Ross requested that the court deem the PSA itself to be a QDRO, name her as the "surviving spouse" under Mr. Ross's pension plans, or compel Mr. Ross's estate to pay her an amount equal to that which she would receive under the pension plans. Ross served a copy of the motion upon (1) her husband's estate; (2) Jeffrey Ross, the parties' son from the marriage and the designated beneficiary of the annuity contract; and (3) Chiloro's attorney. Ross now emphasizes that Chiloro was only noticed "for informational purposes, since she had been copied on prior correspondence regarding the QDROs by [the estate] and Judge." Neither the estate nor Jeffrey Ross opposed the entry of the QDROs in Ross's favor.

Because the underlying action was one for divorce, only Mr. and Ms. Ross were parties. Chiloro was never formally made a party to the action. Nevertheless, Chiloro opposed Ross's motion to enter the QDROs. In addition, Chiloro contested the Family Court's jurisdiction over the matter, arguing that Ross never served Chiloro with a complaint and, even if she had, Chiloro would have removed the matter to federal court pursuant to federal question jurisdiction and preemption by the Employee Retirement Income Security Act, 29 *U.S.C.A.* §§ 1001 to –1461 (ERISA). Chiloro never filed a formal notice to intervene pursuant to *R.* 4:33–1 nor did she request to be joined pursuant to *R.* 4:28–1; rather, she simply filed a brief and presented her position at oral argument.

Before Ross's motion to enter the QDROs was heard, Chiloro filed a complaint on April 12, 1996 in the United States District Court for the District of New Jersey against Ross and various

trustees and administrators of Mr. Ross's Work–O–Lite and R & S/CN pension plans. In the complaint, Chiloro sought payment of survivor benefits under ERISA, arguing that, because a QDRO had not been signed before Mr. Ross's death, she was entitled to the proceeds from the plans as Mr. Ross's surviving spouse. The complaint was later amended to include Nationwide Life Insurance Company and Jeffrey Ross as defendants.

On May 14, 1996, the motion judge heard oral argument on Ross's motion in the Family Part to enter the QDROs in accordance with the PSA. Maintaining that the Family Court did not have jurisdiction over the matter, Chiloro filed a forty-two page brief in opposition to the motion and argued her case on the merits, alleging that the pension plan benefits had vested in her as of the date of Mr. Ross's death, and therefore QDROs should not be entered on behalf of Ross. During the proceedings, the motion judge acknowledged that Chiloro was not a party to the proceedings, but declared that he would "treat[ ] her as basically an intervenor" "for purposes of this hearing today, otherwise ... she really doesn't have any standing to argue before the Court."

After extensive arguments, the motion judge concluded at the hearing that he would sign the QDROs in issue. He stated:

I'm satisfied that the respective rights of the parties vest *at the time that the judgment of divorce is entered* by the Court and the property settlement agreement incorporated into that judgment of divorce. Those rights are enforceable from that time on. The length of time that has elapsed between the granting of the divorce and the submission of the QUADROS does not affect the respective rights of the parties.

[Emphasis added.]

Thus, according to the motion judge, the pension benefits in issue should be equitably distributed to Ross under the terms of the PSA; they did not belong to Chiloro because they had already vested in Ross as of the judgment of divorce and the transfer of assets via the PSA.

On May 24, 1996, the motion judge executed QDROs for the "Work–O–Lite Co., Inc. Money Purchase Plan" and the "Work–O–Lite Co., Inc. Nationwide Insurance Annuity Contract" in accor-

dance with his decision. The judge reserved decision on the R & S/CN plan, erroneously referring to it as two separate plans, because it was not referenced in the PSA. He indicated, however, that if the R & S/CN plan was derivative of Mr. Ross's employment by Work–O–Lite, survivorship benefits from that plan would also belong to Ms. Ross. This decision was memorialized in an order dated June 4, 1996, from which Chiloro now appeals. The order reflected the determination that Chiloro was permitted to intervene, stating:

> [Counsel] appearing on behalf of Gina Chiloro ... who, although not a party to this action, is permitted to take part in the hearing since her client has a financial interest in the outcome.

Prior to the entry of the order, Chiloro, naming herself a third-party defendant, requested the removal of Ross's action to federal court. After the case was removed, Ross moved to remand it back to the Family Court. After oral argument on July 22, 1996, United States District Judge Bissell granted Ross's motion, emphasizing that "absolutely critical to the right of a movant [for removal to federal court] is the status of the removing party as a party defendant." Because Chiloro was not a party defendant in the state court proceeding, she could not remove the case to federal court. Chiloro then filed a notice of appeal of the June 4, 1996 order granting the QDROs as to the Work–O–Lite pension plan and Nationwide annuity contract in favor of Ross.

In the wake of the conflicting claims to each plans' survivor benefits, Warren Siegel, the trustee for the Work–O–Lite and R & S/CN pension plans, sought a court order permitting him to deposit the proceeds of the plans, or $536,286.55, into federal court. This order was executed by Judge Bissell and the money was deposited with the clerk of the court on June 28, 1996.

While Chiloro awaited the appeal of the June 4, 1996 order, the Family Court designated the R & S/CN plan in favor of Ross upon Ross's motion. Although noticed on the motion, Chiloro did not participate in this proceeding. The court's decision was based on the affidavit of Warren Siegel, the trustee of the pension plans, who indicated that most, if not all, of the assets in the plans were

derivative of Mr. Ross's employment by Work–O–Lite and were incorporated into the Work–O–Lite pension plan and Nationwide annuity contract. Specifically, Siegel certified in his affidavit that:

> R & S was a New Jersey general partnership we formed to purchase and lease equipment to National and Work–O–Lite and, ultimately, to various third parties. I estimate that approximately 90% of the rental income generated by R & S during its existence derived from either National or Work–O–Lite.

> \* \* \*

> CN Trucking was a New Jersey Subchapter S corporation we formed in approximately 1982 for the purpose of providing trucking services to National, CN's sole customer. CN leased trucks from third parties and used those trucks to provide trucking services for National. CN Trucking discontinued its operations in or about 1989 and was merged into National.

Chiloro never amended her notice of appeal to include this subsequent decision.

At this point, Chiloro's federal action remained active. On November 27, 1996, Chiloro moved for summary judgment before Judge Bissell on her federal action, arguing that Ross never entered a QDRO which would properly divest Chiloro of the pension benefits as the surviving spouse. Ross also moved for summary judgment, arguing that the principles of *res judicata* precluded Chiloro's federal action, and requesting that the monies deposited with the district court and the proceeds of the Nationwide annuity contract be released to her.

After oral argument, Judge Bissell concluded that Chiloro's status at the hearing needed to first be determined as a matter of state law before either motion could be decided on its merits. Consequently, in a letter opinion dated February 26, 1997, Judge Bissell abstained from determining either motion and stayed the matter with leave to apply to re-open it after this court determined Chiloro's contested status as a party or non party intervenor.

On appeal, Chiloro makes the procedural argument that she was a necessary and indispensable party to the proceedings below and the failure to join her requires this court to vacate the orders entered by the Family Court judge. Furthermore, she asserts

that this action was not cognizable in the Family Part of the Superior Court. With regard to the merits, Chiloro argues that the court erred in granting Ross's application for the entry of the QDROs because at the time they were entered, the pension benefits had already vested in her as Mr. Ross's surviving spouse. Chiloro also contends that the property settlement agreement lacked sufficient specificity to satisfy the requirement for a QDRO under ERISA or to divest her as "surviving spouse" of her pension rights. We address the procedural issues separate from the issues affecting the merits.

## I.

On appeal, Chiloro argues that she was a necessary party to the proceedings below because she was "claiming a right to the very pension moneys which Carol was seeking for herself through the entry of the QDROs." Thus, because Ross failed to join her, Chiloro contends that the motion judge's ruling granting Ross the survivor benefits of the pension plans and annuity contract should be reversed. According to Chiloro, the action was not even cognizable in the Family Part.

As the motion judge noted, Chiloro possessed a financial interest in the outcome of the case because any award to Ross of survivor benefits would necessarily strip Chiloro of those same benefits. Chiloro argues, therefore, that "pursuant to *R.* 4:28–1, [Ross] was obligated to join [Chiloro] as a party."

We acknowledge that, pursuant to *R.* 4:28–1, Chiloro should have been joined as a party because she claimed an interest in the survivor benefits (the subject of the action) and the disposition of such benefits in her absence impedes her ability to protect that interest. Moreover, a substantial risk of inconsistent outcomes could result if Chiloro was not joined in the Family Court action, in that one result could exist in Family Court with a possibly different result existing in federal court. Chiloro argues, therefore, that "it was error for the Court below to adjudicate this

matter without ordering that Gina be joined as an indispensable party." We disagree.

R. 4:28–1 follows verbatim Rule 19 of the Federal Rules of Civil Procedure. The comment in the New Jersey Rules quotes the introductory comment of the Advisory Committee's notes on the federal rule, which states in part:

> Even if the court is mistaken in its decision to proceed in the absence of an interested person, it does not by that token deprive itself of the power to adjudicate as between the parties already before it through proper service of process. But the court can make a legally binding adjudication only between the parties actually joined in the action. It is true that an adjudication between the parties before the court may on occasion adversely affect the absent person as a practical matter, or leave a party exposed to a later inconsistent recovery by the absent person. These are factors which should be considered in deciding whether the action should proceed, *but they do not themselves negate the court's power to adjudicate as between the parties who have been joined.*
>
> [Emphasis added.]

Thus, a court may adjudicate a matter before it, even if all parties are not joined therein. Consequently, the motion judge had jurisdiction to adjudicate this matter.

Chiloro next argues that this type of action is not even cognizable in the Family Court. Because her claim "arises under federal law and requires an analysis of ERISA's preemption and anti-alienation provisions," Chiloro argues that it is not a claim unique to and arising out of a family-type relationship, and therefore may not be decided by a Family Court. Not so. R. 5:1–2, which sets forth those actions which are cognizable in the Family Part, states in pertinent part:

> All civil actions in which the principal claim is unique to and arises out of a family or family-type relationship shall be brought in the Family Part. Such actions include all actions and proceedings provided for in Chapters II and III of Part V; *all civil actions and proceedings formerly designated as matrimonial actions;* all civil actions and proceedings formerly cognizable in the Juvenile and Domestic Relations Court; *and all other civil actions and proceedings unique to and arising out of a family or a family-type relationship.*
>
> [Emphasis added.]

In *Brennan v. Orban,* 145 *N.J.* 282, 678 *A.*2d 667 (1996), the plaintiff filed a divorce complaint and later filed a separate tort action in the Law Division for physical abuse allegedly suffered at

the hands of her husband, the defendant. The Family Part consolidated the two actions, and the plaintiff appealed. The Supreme Court determined that the Family Part could hear both actions. *Id.* at 301–02, 678 *A.*2d 667. *Brennan* makes it clear that the scope of the Family Court's ancillary jurisdiction is indeed broad. Under the doctrine of ancillary jurisdiction,

> once the Chancery Division asserts jurisdiction over a complaint seeking equitable relief, it has the power to dispose of ancillary legal claim and award money damages. Legal issues are ancillary if they are germane to or grow out of the subject-matter of the equitable jurisdiction.
>
> [*Id.* at 293, 678 *A.*2d 667 (citation and quotation omitted).]

Ross's original application was to enforce the PSA agreement by requesting the entry of QDROs. The Family Court had proper jurisdiction over this action as it arose from a family matter—the PSA. As the Advisory Committee's note discussing joinder indicates, the Family Court had the power to adjudicate the matter, regardless of whether Chiloro was joined or not joined as a party. If she was not joined as a party, however, the court's decision would not be binding on her. The determinative question, therefore, is whether Chiloro participated in the Family Court action to the extent that she should be bound by that court's decision.

█ At the initial hearing to determine whether QDROs should be entered in favor of Ross, the motion judge indicated that he would treat Chiloro as an intervenor "for purposes of this hearing today" in order to permit arguments by her counsel. Chiloro's counsel never objected to this classification, and in fact stated, "if you're going to treat Gina Chiloro as an intervenor, then I would like to have a piece of paper from [Ross's counsel] that I can take to Federal Court and remove this action to Federal Court." The judge responded, "Well, no. I said for purposes of this hearing today, otherwise, if it were not for me considering her in a position of an intervenor, . . . she really doesn't have any standing to argue before this court."[1]

---

[1] During argument on November 22, 1996 regarding the R & S/CN plan, the motion judge specifically confirmed that he treated Chiloro as an intervenor

Chiloro argues that "[t]o be treated as an 'intervenor' for 'purposes of this hearing' is not the same as being a full-fledged party with all of the rights (and binding obligations) visited upon a party." Chiloro continues that she should not be "saddle[d] ... with the burdens assessed against a party" just because she was permitted to argue her case on the merits. As a non-party, Chiloro contends that she "had no opportunity to seek or obtain documents; to take depositions; or to obtain information through Interrogatories or Requests to Admit." Thus, Chiloro argues that she was not entitled to those modes of discovery which a normal litigant is entitled to in an action.

To support her arguments, Chiloro relies on *Biddle v. Biddle,* 166 *N.J.Super.* 1, 398 *A.*2d 1297 (App.Div.1979). There, plaintiff loaned money to her son and his wife so they could purchase property on which to build a house. When the couple divorced, plaintiff filed a motion to intervene to protect her interest in the loan as a lien on the property before it was equitably distributed. The court denied her motion. During the divorce proceedings, she testified as a witness on her son's behalf, arguing that the lien reduced the value of the premises subject to equitable distribution and increased the debts of the relationship. Thereafter, the wife was awarded the property free and clear of any alleged liens by the plaintiff. No appeal was taken; rather, plaintiff filed a separate action asserting her claim to a lien on the premises. The issue before the court was whether plaintiff was bound by the previous judgment that no lien existed on the property.

We determined that plaintiff was not bound by the decision in the divorce action, as she was "plainly not a party to the divorce action," and her interest was not protected by her son, who could not be in privy with her because his ownership in the land conflicted with her claim. *Id.* at 4, 398 *A.*2d 1297. We commented that the plaintiff, as a witness, may have ultimately

during the May 14, 1996 hearing. Chiloro's counsel was not present on November 22, 1996, although she was noticed.

presented her claim to the same extent that she could have were she a real party, but determined that "participation as a trial witness does not, without more, bind one to the determination therein." *Id.* at 7, 398 *A.*2d 1297 (citations omitted). We also stated that "a person who has unsuccessfully attempted to intervene in an action prior to the entry of judgment is not bound as to the claims adjudicated therein unless he is thereafter represented by one who is a party." *Ibid.*

*Biddle* is clearly distinguishable. Here, Chiloro did not participate as a witness on behalf of another party. Instead, she appeared on her own behalf and presented her full argument on the merits to the Family Court judge. By doing so, plaintiff effectively intervened, despite the absence of a formal motion to do so. *See United States v. RMI Co.,* 599 *F.*2d 1183, 1187 (3d Cir.1979) (stating that one who appears specially in the proceedings may be treated, "de facto, as an intervenor.").

■ We hold that a judgment may be binding as an estoppel on a person who, although not nominally or formally a party to the action in which it was rendered, submitted his or her interest in the subject matter of the litigation to the consideration of the court and invited its adjudication thereon. *See 50 C.J.S. Judgment* § 859 (1997). Chiloro submitted a brief with accompanying exhibits and certifications extensively outlining her interests to the Family Court. When the motion judge informed her that he was treating her as an intervenor, even if only for purposes of this hearing, she did not object. She thereby submitted to the jurisdiction of the court and invited its adjudication as to her claim in spite of her constant reminders on the pleadings that she contested the jurisdiction of the court. Most significantly, Chiloro was not prejudiced by her status as an intervenor "only for the purposes of this hearing," because that hearing represented the entire claim. This was not a protracted lawsuit, it was simply a motion for the entry of QDROs, which was granted on the same day as the hearing.

Chiloro asserts that she was substantially deprived of her rights by being treated as an intervenor without being given the benefit of discovery. However, discovery was not needed to address the issue in this lawsuit of whether federal law governs the entitlement of the survivor benefits of Mr. Ross's pension plans and annuity contract. The facts before this court are obvious: two pension plans and one annuity contract existed at the time of Mr. Ross's death. The information necessary to determine who was entitled to the proceeds of each were already before the court. No further discovery was needed, and Chiloro was not deprived of her rights by being classified as an intervenor in the Family Court Action.

Chiloro argues that, despite the motion judge's statement during the hearing that he would treat her as an intervenor, his final order indicates that she was "not a party to this action." The order further states that Chiloro, or her counsel, was "permitted to take part in the hearing since her client has a financial interest in the outcome." Chiloro was treated as an intervenor and fully participated at the hearing, whether or not the order pinned an appropriate label on her.

■ Moreover, regardless of the proceedings below, Chiloro effectively intervened by appealing the June 4, 1996 order. *See Local 322, Allied Industrial Workers v. Johnson Controls, Inc.,* 921 *F.*2d 732 (7th Cir.1991) (barring plaintiff, who was permitted to intervene only on appeal, from relitigating its claim in a subsequent action under the doctrine of *res judicata* ), *cert. denied,* 500 *U.S.* 942, 111 *S.Ct.* 2238, 114 *L.Ed.*2d 480 (1991). In *Local 322,* the court quoted the following from a decision in the district of Alaska:

[A party] is entitled to its day in court on these issues and intervention in those proceedings is not its only choice. Indeed, it is only due to the fact that the intervenors requested to be allowed into this action that this judgment may be binding on them in the other case.

[*Id.* at 735 (quoting *Alaska v. Andrus,* 429 *F.Supp.* 958, 964 (D.Alaska 1977), *aff'd,* 591 *F.*2d 537 (9th Cir.1979)).]

The same applies here. Because Chiloro chose to submit a brief and argue the merits of her case, both at oral argument and on appeal, this court's judgment will be binding on her. That she was not entitled to conduct her own discovery, as mentioned, is irrelevant to the outcome of this case. Moreover, Chiloro submitted her own discovery with her briefs and certifications filed in the Family Court.

Thus, we deem the active level of Chiloro's participation in both the proceedings below and on appeal sufficient to consider Chiloro an intervenor in this action. The Family Court had proper jurisdiction over the matter and Chiloro is therefore bound by its decision.

## II.

Chiloro argues that the Family Court should not have executed the QDROs entitling Ross to the survivor benefits of Mr. Ross's pension plans and annuity contract. By concluding that Ross's rights vested at the time that the judgment of divorce was entered by the Court with the attached PSA, Chiloro stresses that the motion judge ignored applicable provisions under ERISA. According to Chiloro, the judge "erroneously applied a 'vesting' concept which finds no support in ERISA or the legal authorities interpreting ERISA, and ignored case law" which requires strict compliance with statutory requirements in order to divest survivor benefits from the actual surviving spouse.

Prior to 1974, pension plan participants could freely assign or alienate both their own interests and survivorship interests in the plans pursuant to the Internal Revenue Code. *Hawkins v. Commissioner of Internal Revenue*, 86 *F*.3d 982, 988 (10th Cir.1996). In 1974, however, Congress enacted the Employee Retirement Income Security Program (ERISA), which changed existing law by providing that benefits obtained "under [a qualifying pension] plan may not be assigned or alienated." 29 *U.S.C.A.* § 1056(d)(1).

Under ERISA, survivor benefits from a pension plan automatically pass to the surviving spouse upon a participant's death. 29 *U.S.C.A.* § 1055(a)(1). That section states in pertinent part:

Each pension plan to which this section applies shall provide that -

(1) in the case of a vested participant who does not die before the annuity starting date, the accrued benefit payable to such participant shall be provided in the form of a qualified joint and survivor annuity, and

(2) *in the case of a vested participant who dies before the annuity starting date and who has a surviving spouse, a qualified preretirement survivor annuity shall be provided to the surviving spouse of such participant.*

[Emphasis added.]

Congress made it clear that it intended ERISA to "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan," which included employee pension plans. 29 *U.S.C.A.* § 1144(a); 29 *U.S.C.A.* § 1002(3). After ERISA was enacted, however, courts were divided on whether the complete restriction on alienation of pension plans preempted state domestic relations laws which permitted assignment of the benefits of such plans for the purpose of dividing marital property. *Compare Francis v. United Tech. Corp.,* 458 *F.Supp.* 84, 85–86 (N.D.Cal.1978) (holding that ERISA preempts state community property law permitting division of plan benefits for domestic support purposes) *with American Tel. & Tel. Co., v. Merry,* 592 *F.*2d 118 (2d Cir.) (determining that ERISA does not preempt state laws allowing the attachment of plan benefits in order to satisfy family support obligations).

In 1984, Congress responded by enacting the Retirement Equity Act (REA). The REA created a limited exception to ERISA preemption, allowing pension plan benefits to be divided pursuant to state law where a "qualified domestic relations order" (QDRO) exists. 29 *U.S.C.A.* § 1144(b)(7). Consequently, with respect to pension plans, ERISA preempts all marital dissolution decrees that do not meet the statutory definition of a QDRO. Thus, state law will prevail only where pension plan benefits are alienated pursuant to a valid QDRO. If no QDRO exists, ERISA

and federal common law must be applied to determine whether the benefits were properly alienated.

Under ERISA, only two means exist by which a participant may designate a beneficiary other than his own spouse: waiver by the spouse or entry of a QDRO. The waiver provision is set forth in 29 *U.S.C.A.* § 1055(c)(2), which states:

Each plan shall provide that an election under paragraph (1)(A)(i) shall not take effect unless:

(A)(i) *the spouse of the participant consents in writing to such election,* (ii) such election designates a beneficiary (or a form of benefits) which may not be changed without spousal consent (or the consent of the spouse expressly permits designations by the participant without any requirement of further consent by the spouse), and (iii) the spouse's consent acknowledges the effect of such election and is witnessed by a plan representative or a notary public, or

(B) it is established to the satisfaction of a plan representative that the consent required under subparagraph (A) may not be obtained because there is no spouse, because the spouse cannot be located, or because of such other circumstances as the Secretary of Treasury may by regulations prescribe.

[Emphasis added.]

Section 1056(d)(3)(A) allows alienation where a QDRO exists. That section provides:

Paragraph (1) [stating that pension plan benefits may not be assigned or alienated] shall apply to the creation, assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order, *except that paragraph (1) shall not apply if the order is determined to be a qualified domestic relations order.* Each pension plan shall provide for the payment of benefits in accordance with the applicable requirements of any qualified domestic relations order.

[Emphasis added.]

■ Clearly then, where a surviving spouse has not waived her right to benefits and a QDRO does not exist, ERISA prevents a participant from naming a beneficiary other than a surviving spouse. In that case, a participant will be unable to alienate any of his or her pension plans, even by distribution in a PSA. *Hawkins, supra,* 86 *F.*3d at 988.

The following key facts are undisputed: Chiloro was married to Mr. Ross when he died, and was by definition his surviving spouse, notwithstanding the PSA in which Mr. Ross designated Ms. Ross as the surviving spouse. Chiloro did not waive her rights to the

survivor benefits of Mr. Ross's pension plans. Where no waiver exists, ERISA prohibits the alienation or assignment of pension plan benefits. 29 *U.S.C.A.* § 1056(d)(1). This prohibition even applies "to the creation, assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order." 29 *U.S.C.A.* § 1056(d)(3)(A). ERISA defines "domestic relations order" as:

> any judgment, decree, or order (including approval of a property settlement agreement) which -
>
> (I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child or other dependent of a participant, and
>
> (II) is made pursuant to a State domestic relations law (including a community property law).
>
> [29 *U.S.C.A.* § 1056(d)(3)(B)(ii).]

However, ERISA's prohibition on alienation of pension plan benefits "shall not apply if the order is determined to be a *qualified* domestic relations order." 29 *U.S.C.A.* § 1056(d)(3)(A) (emphasis added). Therefore, the critical issues are whether the PSA could itself be considered a QDRO and whether the QDROs which were entered *after* Mr. Ross's death are valid. The issues are addressed in this order.

Pursuant to 29 *U.S.C.A.* § 1056(d)(3)(B), a qualified domestic relations order must first "create[ ] or recognize[ ] the existence of an alternate payee's right to, or assign[ ] to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan." Clearly, the PSA in question creates a right in Ross, as the alternate payee, to receive "one-half (1/2) of the Husband's pensions and/or annuities from Work–O–Lite Co., Inc. and National Lighting Co., Inc." Furthermore, it entitles Ross to "the survivor annuity of the pension plans, as per the provisions of the plans." Thus, the PSA satisfies these requirements of a QDRO.

In addition, Section 1056(d)(3)(C) states:

> A domestic relations order meets the requirements of this subparagraph only if such order clearly specifies -

(i) the name and last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,

(ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

(iii) the number of payments or period to which such order applies, and

(iv) each plan to which such order applies.

The foregoing requirements for the creation of a QDRO must be strictly complied with before a domestic relations order may be considered "qualified." *Hawkins, supra,* 86 *F.*3d at 993 (concluding that the Internal Revenue Code analog of Section 1056(d) "should be accorded its plain meaning, and not interpreted so as to allow the parties to omit the requested information whenever it is convenient or even perhaps logical to do so.").

During the hearing on May 14, 1996, the motion judge concluded that "as far as the QUADRO is concerned versus the judgment of divorce, I'm satisfied that there must be a specific QUADRO, that the judgment of divorce in and of itself would not suffice." Yet, he determined that Ross's rights to the pension plan benefits vested at the time of the divorce judgment. Under ERISA, that is not possible unless a QDRO existed at the time of the divorce. Chiloro argues that a valid QDRO did not exist at that time because the PSA lacked the requisite specificity. We disagree insofar as the Work–O–Lite pension plan is concerned.

First, the PSA does designate Ross's name and address as the alternate payee of Mr. Ross's pension plans. While it does not specifically refer to Ross as "the alternate payee," such language is not required. In *Hawkins, supra,* a similar issue was presented. A marital settlement agreement purported to give the deceased's ex-wife $1 million in pension benefits. In determining whether the ex-wife was required to pay taxes on such benefits, the court discussed whether the marital settlement agreement met the requirements of a QDRO. The court determined that, although the plan did not specifically designate the ex-wife as an alternate payee, it expressly stated that she " 'shall receive' $1 million 'from' the Plan," thereby creating or recognizing a contractual right in

the ex-wife as an alternate payee. In addition, the court noted that the ex-wife fell within ERISA's definition of an "alternate payee," in that she was "any spouse [or] former spouse ... of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant." *Id.* at 990 (quoting *I.R.C.* § 414(p)(8), the analog to 29 *U.S.C.A.* § 1056(d)(3)(K)). Thus, *Hawkins* supports the finding that the first requirement of a QDRO is met.

Second, the plan designates the amount or percentage of the participant's benefits to be paid by the plan to the alternate payee. The PSA specifically gives Ross the right to one-half of Mr. Ross's pension benefits while he is alive, and states that she "shall receive *the* survivor annuity of the pension plans, as per the provisions of the plans." (Emphasis added). No other logical argument exists but that entitlement to the survivor annuity is actually entitlement to all of the survivor annuities of the pension plans. This is true especially because no other designation of benefits is made, and because the PSA states, "Carol Ross shall be deemed to be the surviving spouse and shall be designated beneficiary for *any* survivor annuity." (Emphasis added). Thus, the second requirement for a QDRO is met.

Third, the plan must specify the number of payments to the alternate payee or the period to which the plan applies. "Any" survivor annuity payments can be read to include *all* survivor annuity payments. Thus, the number of payments is logically the total of all payments for the entire duration of the pension plan. The third requirement of a QDRO is therefore satisfied.

The fourth prerequisite of a QDRO is that the order must designate *each plan* to which such order applies. The PSA only entitles Ross to "the Husband's pensions and/or annuities from Work–O–Lite Co., Inc. and National Lighting Co., Inc." The PSA states that, "for the purposes of the defined benefit plan and the defined contribution plan, Carol Ross shall be deemed to be the surviving spouse and shall be designated beneficiary for any

survivor annuity." The Work–O–Lite, Inc. Money Purchase Pension Plan is not expressly designated, but the PSA refers to the Work–O–Lite Co., Inc. pension plan. We believe the designation in the PSA is specific enough as to the Work–O–Lite Co., Inc. pension plan to satisfy the fourth criteria of a QDRO. *See Metropolitan Life Ins. Co. v. Fowler*, 922 *F.Supp.* 8, 14 (E.D.Mich.1996) (finding that a divorce judgment which specified that the designation of "any and all life insurance policies by virtue of ... employment" satisfied the fourth requirement of a QDRO). Therefore, insofar as this specific plan was concerned, the PSA met the QDRO requisite, satisfying the alienation provision of the REA for the benefit of Ross upon the death of her former husband.

 We, however, cannot come to the same conclusion as to the Nationwide annuity contract and the R & S/CN pension plan which are not referred to at all in the PSA. While those plans may have been derivatively funded from a pension plan formerly under the Work–O–Lite Co., Inc. name, or funds from the Work–O–Lite and National Lighting companies, respectively, that does not imbue them with the specificity required under the REA.

 Recently, the Internal Revenue Service issued sample language to be included in QDROs, stating that:

A QDRO must clearly identify *each plan* to which the QDRO applies. A QDRO can satisfy this requirement by stating the full name of the plan as provided in the plan document.

[*IRS Notice 97–11, Internal Revenue Bulletin 1997–2* (January 13, 1997).]

Ross correctly argues that this is simply a suggestion, and not mandatory. Regardless, it is clear that Congress intended that a domestic relations order set forth more than a general idea of the plans to which it was referring. While Mr. Ross most likely intended that his ex-wife receive all survivorship benefits of his pension plans and annuity contract, the "subjective intentions of the parties are not controlling," rather, the language of the order itself determines "whether a domestic relations order qualifies as a QDRO." *Hawkins, supra*, 86 *F.*3d at 989–90 (citing *Commission-*

*er v. Lester*, 366 *U.S.* 299, 304–05, 81 *S.Ct.* 1343, 1346–47, 6 *L.Ed.*2d 306 (1961)). Except for the Work–O–Lite Co., Inc. pension plan, the PSA does not designate with the required specificity any of the other plans in lieu of filing a QDRO. Therefore, no QDRO existed as to those plans and they were not properly alienated under ERISA. For that reason, we must reverse the Family Court judge's decision as to those plans.

Chiloro next argues that the motion judge improperly entered the QDROs after Mr. Ross's death. The judge determined that Ross's rights to her ex-husband's pension plan benefits vested in her as of the entry of the judgment of divorce. Chiloro contends, however, that as of Mr. Ross's death, the pension plan benefits automatically vested in her. Ross responds that ERISA does not require the entry of QDROs prior to the time that a participant dies or remarries. Because QDROs are exempted from ERISA preemption, Ross contends that a state court may determine whether to allow a QDRO to relate back to the judgment of divorce. According to Ross, even where a QDRO is entered after a participant's death, "it automatically supersedes the rights of a surviving spouse regardless of when it is entered." We disagree.

In *Miko v. Miko*, 283 *N.J.Super.* 287, 661 *A.*2d 859 (Law Div.1994), a judgment of divorce required a husband to pay a certain amount in unallocated support to his ex-wife and his minor child. An order was entered garnishing his income to satisfy his support obligations. While he was working, the husband remarried. About two years later, he retired, and his second wife started receiving benefits under his pension plan. Later, the court entered a QDRO against his pension plan for support arrearages owed as a result of the prior marriage. The court phrased the central issue as "whether the judgment [for support arrearages] entered against [the husband] can be collected from the survivorship benefit portion of his pension plan by someone other than the named beneficiary." *Id.* at 292, 661 *A.*2d 859.

The court determined that the first wife was entitled to the survivor benefits because a valid judgment had been entered against the husband. While mentioning the fact that ERISA was applicable, the court never discussed ERISA or distinguished that pension plan survivorship benefits are inalienable under the statute. Rather, the court based its decision on the belief that "child support and even alimony arrearages due his first wife take precedence over whatever obligation he might have to his second wife." *Id.* at 294, 661 *A.*2d 859.

We disagreed with *Miko* in *Seavey v. Long,* 303 *N.J.Super.* 153, 696 *A.*2d 102 (App.Div.1997). There, a property settlement agreement entitled the decedent's first wife to fifty percent of the husband's state pension benefits. The husband remarried. The issue before us was whether the second wife was required to share her widow's benefits with the first wife. We determined that the second wife alone was entitled to widow's benefits, which we deemed to be "her property" under the state retirement statute. *Id.* at 157–58, 696 *A.*2d 102. We went on to observe:

> Insofar as *Miko* might provide a basis for plaintiff in our case to obtain or even share in the pension payable to the second wife, we disagree with the conclusion expressed in *Miko,* although we appreciate the humanity that fostered it.
>
> [*Id.* at 160, 696 *A.*2d 102.]

Here, the required beneficiary change was not properly made as to the R & S/CN plan, in that a QDRO was not entered prior to Mr. Ross's death which would allow the proceeds to be alienated under ERISA. Therefore, Chiloro is entitled to the proceeds of that plan as Mr. Ross's surviving spouse. As discussed above, the PSA itself is specific enough to be deemed a QDRO which properly alienated the Work–O–Lite Co., Inc. Money Purchase Pension Plan. Thus, the proceeds from that plan must pass to Carol Ross.

Without a doubt, it is more equitable to satisfy the obvious intent of the PSA agreement and grant Ross the survivor benefits of all of Mr. Ross's pensions pursuant to the language in the PSA that Ross shall be deemed the surviving spouse for any survivor annuity. It is clear, however, that survivorship benefits are

governed by ERISA unless a valid QDRO exists or the PSA satisfies the QDRO prerequisites under the REA. The statute specifically provides that where a domestic relations order which is not qualified exists, federal common law preempts state law. 29 *U.S.C.A.* § 1056(d)(3)(A); *Hawkins, supra,* 86 *F.*3d at 988 (stating that "a marital dissolution decree that does not fall within the limited QDRO exception is preempted by ERISA, and any assignment of pension interests under such an order is unenforceable, even if intended as part of a family support order."). The unfortunate result is that equity will not prevail.

Here, no QDRO existed at the time of Mr. Ross's death. No federal case has allowed a QDRO to be entered after a participant's death. In fact, in *Karem v. Commissioner,* 100 T.C. 521, 1993 WL 207685 (1993), during divorce proceedings, a wife consented to a lump-sum distribution from her husband's pension plan pursuant to a property distribution plan. A consent judgment was ordered memorializing the agreement and directing the wife to enter a QDRO. The court determined that the consent judgment itself was not a QDRO and never considered entering one after the fact. Instead, the court supported the proposition that "an order that does not qualify as a QDRO contravenes the direct language of ERISA's antiassignment provision and does not divest a plan participant of benefits under an ERISA plan." *Id.* at 529 (citation omitted). Under both *Hawkins* and *Karem,* federal law is clear that where a QDRO does not exist, one should not be entered to save the meaning of a property settlement agreement.

Ross argues that she was unable to prepare QDROs before Mr. Ross's death because Mr. Ross was not cooperative or forthcoming with pertinent information. She attributes his lack of cooperation to his hospitalization shortly after their divorce hearing. Conversely, the estate, in opposing Ross's informal request to enter QDROs, argued that it was Ross who was uncooperative. According to the estate, Ross was given all of the pension information but never responded to their inquiries about a QDRO which was to be approved by the estate. The motion judge never determined the

merits of either party's argument. Regardless, as discussed above, New Jersey's concepts of equity cannot be applied and a QDRO cannot be entered after the fact.

It has been pointed out to us by the parties that the Nationwide Insurance Annuity contract may not qualify as a pension plan under ERISA for which alienation of benefits is prohibited. This issue was not addressed in either party's brief, except for a footnote in Ross's brief and at argument.

From the record, it appears that the Nationwide annuity contract was purchased out of a portion of the proceeds of a separate pension plan entitled "Work–O–Lite Defined Benefit Plan." In an opinion letter by the estate's expert regarding ERISA-based claims, it was mentioned that if the pension plan was indeed terminated and the annuity contract purchased from its proceeds, it would not be a "plan for the purposes of ERISA." No authority was provided to support this opinion. Our discussion of the issue, and any others related thereto, without adequate briefing or expert testimony, if needed, is only illustrative of our inability to deal with the issue on the record before us.

As a final note, because Ross may not receive all of the benefits negotiated for and agreed to in the PSA by reason of the impact of federal or state law, she may still be entitled to pursue her claim against other assets, if any remain, of Mr. Ross' estate in order to carry out the intention of the PSA.

We, therefore, affirm as to the Work–O–Lite Co., Inc. Money Purchase Pension Plan, allowing the survivor benefits to be distributed to Carol Ross. We reverse as to the R & S/CN plan and direct that those survivor benefits be distributed to Gina Ann Chiloro. We reverse and vacate the QDRO as to the Nationwide Insurance Annuity and remand for a determination of whether it may be alienated under federal or state law, or alternatively, reverse and preserve for determination by the federal court should the issue be properly presented in that forum.

Affirmed in part; reversed in part; reversed and remanded in part.