

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-24-1999

# Samaroo v. Samaroo

Precedential or Non-Precedential:

Docket 98-5245

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Samaroo v. Samaroo" (1999). *1999 Decisions.* Paper 265.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/265

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 24, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-5245

LOUISE ROBICHAUD SAMAROO,

v.

WINSTON R. SAMAROO,
(D.C. Civil No. 89-2215)

AT&T MANAGEMENT PENSION PLAN,

v.

LOUISE M. ROBICHAUD,
(D.C. Civil No. 89-2216)

      Louise M. Robichaud.
      Appellant

On Appeal from the United States District Court
for the District of New Jersey
(D. C. Civil Nos. 89-2215 and 89-2216)
District Judge: Garrett E. Brown, Jr.

Argued: April 27, 1999

Before: MANSMANN, Circuit Judge, and
WEIS and JOHN R. GIBSON, Senior Circuit Judges.*

(Filed: September 24, 1999)

_____

* The Honorable John R. Gibson, Senior United States Circuit Judge for
the Eighth Circuit Court of Appeals, sitting by designation.

Louise M. Robichaud (ARGUED)
Kingston, NJ 08528

 Pro Se Appellant

Christopher H. Mills (ARGUED)
Somerset, NJ 08873

 Attorney for Appellee

OPINION OF THE COURT

JOHN R. GIBSON, Senior Circuit Judge.

Louise Robichaud appeals the district court's[1] entry of summary judgment against her on AT&T Management Pension Plan's complaint for declaratory relief. The Plan sought a declaration that Robichaud was not entitled to pre-retirement survivor's annuity benefits of her former husband, Winston Samaroo, who died while still actively employed by AT&T Technologies. Although the Samaroo-Robichaud divorce decree did not state that Robichaud should receive benefits under Samaroo's pre-retirement survivor's annuity, after Samaroo's death Robichaud obtained a nunc pro tunc amendment to the divorce decree purportedly creating such an entitlement. The district court held that the amended order was not a qualified domestic relations order capable of conferring on Robichaud the benefits she seeks. We affirm.

Robichaud and Samaroo were divorced on October 25, 1984, by the New Jersey Superior Court, Chancery Division. The divorce decree incorporated a property settlement reached by the parties which had the following language concerning Robichaud's rights in Samaroo's pension benefits:

> (d) Pensions, Profit Sharing and Bell System Savings
> Plan

_____

1. The Honorable Garrett E. Brown, Jr., United States District Judge for the District of New Jersey.

> Savings Plan-- (1) Husband has a vested pension
> having a present value, if husband were to retire at
> this time, of $1,358.59 per month. At the time of
> husband's retirement and receipt of his pension he
> agrees to pay to wife one half of said monthly amount.

Neither the decree nor the property settlement mentions any rights to Samaroo's survivor's annuity.

Samaroo died at the age of 53 on September 20, 1987, about three years after the divorce, while still actively employed by AT&T. He was covered under the AT&T Management Pension Plan, a defined benefit plan which provided pensions and survivors' annuities in amounts based on a percentage of the employee's average salary times years of service. Based on Samaroo's age and years of service, he had a vested right to a deferred vested pension, which would have begun, at the earliest, at age 55. Because Samaroo did not live to the age to qualify to receive pension payments, there were, strictly speaking, no pension benefits that ever became payable in respect of Samaroo. Therefore, the benefit expressly mentioned in the divorce settlement agreement never came to fruition.

However, the Plan provides a pre-retirement survivor annuity available to the surviving spouse of any Plan participant who died after vesting but before retiring. If there is no surviving spouse, there is no annuity.

Under the Employee Retirement Income Security Act of 1974 as it existed at the time of the Samaroo-Robichaud divorce, it was unclear whether state divorce decrees could effectively convey a share in one spouse's pension benefits to the other spouse. See generally Dial v. NFL Player Supplemental Disability Plan, 174 F.3d 606, 610 (5th Cir. 1999); ABA Section of Labor and Employment Law, Employee Benefits Law 171-72 (1991). The Retirement Equity Act of 1984, Pub. L. No. 98-397, enacted in August 1984 and effective January 1, 1985, amended ERISA to provide that pension benefits may be alienated by means of a Qualified Domestic Relations Order (known as a QDRO), 29 U.S.C. S 1056(d)(3)(A) (1994). Although the Retirement Equity Act was not in effect on October 25, 1984, the date of the Samaroo-Robichaud divorce, plan administrators

3

may, in their discretion, treat orders entered before the date of the Act as QDROs. S. Rep. No. 98-575, at 23 (1984), reprinted in 1984 U.S.S.C.A.N. 2547, 2569.

The Plan denied Robichaud's claim for a pre-retirement survivor's annuity because the divorce decree did not mention any entitlement to such rights, and in the absence of a surviving spouse or a QDRO designating a former spouse as such, there was simply no pre-retirement survivor's annuity payable in respect of Samaroo.2

_____

2. Robichaud has chosen to amend the original divorce decree rather than relying on that decree to entitle her to the pre-retirement survivor's annuity; however, she suggests in her reply brief that the original decree could have been read to give her that right. Robichaud tells us the only issue in this case is the validity of the amended order, and therefore we conclude that the adequacy of the original decree is not before us. However, we briefly observe that there are several problems with reading the original decree to convey a survivor's annuity to Robichaud. First, the property settlement apparently only gives Robichaud the right to receive one half of Samaroo's pension payments of $1,358.89 per month, the value of Samaroo's pension rights at the time of the divorce. This shows an intent to divide property rights existing at the time of the divorce, not to give Robichaud an interest in post-divorce earnings. Robichaud now claims half of all benefits payable with respect to Samaroo, including benefits earned after the divorce.

Second, the original decree entitles Robichaud to receive the benefit payments at the time they were paid out to Samaroo, rather than conveying to her a portion of Samaroo's interest in the Plan. Since no benefits became payable to Samaroo himself, the original decree evidently did not convey anything. See Dugan v. Clinton, No. 86 C 8492, 1987 WL 11640, at *3-*4 (N.D. Ill. May 22, 1987) (unpublished) (divorce order entitling wife to portion of husband's "monthly pension plan benefit payment" when received did not convey interest in pre-retirement survivor annuity); see generally Pamela D. Perdue, "Pension and Welfare Benefit Administration QDRO Guidelines, 62 ALI-ABA Course of Study Materials 743, 756-57 (1998) (distinguishing between "separate interest" QDROs that divide the actual pension, and "shared payment" QDRO's which merely split the stream of payments and in which "the alternate payee will not receive any payments unless the participant receives payments or is already in pay status").

Third, the original decree was silent on the issue of survivor's rights. Congress has required QDROs to be quite specific in order to convey ERISA benefits. The statute requires a QDRO to state specifically the

4

Robichaud filed a motion in the New Jersey Superior Court, Chancery Division, to amend the Final Judgment of Divorce nunc pro tunc to convey to her a right tofifty percent of the preretirement survivor's annuity payable in respect of Samaroo. Samaroo v. Samaroo, 743 F. Supp. 309, 311 (D.N.J. 1990). Robichaud joined the Plan as a defendant in the divorce case. Id. The Plan removed the action to federal court and also filed a complaint for declaratory relief in the same court. Id. The two cases were consolidated. The district court remanded that portion of the removed case that involved the terms of the divorce, but retained jurisdiction of Robichaud's claim against the Plan for the retirement benefits. Id. at 317.

After a hearing, the New Jersey state court held that the Plan did not have standing to object to alteration of the divorce decree. Winston Samaroo's estate did not oppose Robichaud's request to amend the decree nunc pro tunc, since conveying the survivorship rights once Samaroo was dead did not cost the estate anything, but undid the effect of Samaroo dying without a survivor. The attorney who drafted the agreement testified that the issue of survivor's benefits never came up at the time of the agreement:

_____

extent of the alternate payee's interest in the plan, 29 U.S.C. S 1056(d)(3)(C)(ii) and (iii), and states that for purposes of survivor annuities, a former spouse can be treated as a surviving spouse "to the extent provided in any qualified domestic relations order." 29 U.S.C. S 1056(d)(3)(F). In Roth v. Roth, 506 N.W.2d 900 (Mich. Ct. App. 1993), the divorce order conveyed an interest in pension rights, but said nothing about survivorship rights. After the husband's death, the former wife sought to amend the decree retroactively to give herself the survivorship rights that otherwise would lapse. The Michigan courts, applying federal law, held that the decree did not entitle the former wife to a pre-retirement survivor's annuity. Id. at 903. Compare Indiana State Council of Carpenters Pension Fund v. Veclotch, 785 F. Supp. 106,108– 110 (N.D. Ind. 1992) (genuine issue of fact as to parties' intent regarding survivor annuity precluded summary judgment where divorce agreement referred only to pension, but there was extraneous evidence that parties negotiated survivorship issue and intended former wife to receive survivorship rights).

Fourth, the original decree was entered before the effective date of the Retirement Equity Act. See page 3, supra.

5

Q: That section [of the agreement] is silent on the issue of survivor benefits?

A: That's correct.

Q: Okay. Was the survivor benefit addressed at that time?

A: No, it never came to mind at that time, it wasn't brought up at all by you [Robichaud], or by Winston, or by me.

Robichaud herself testified that "neither Winston [nor his attorney] or I thought about the survivor rights to this pension." Based on the evidence that the divorce was amicable, the state court amended the divorce decree retroactively to give Robichaud "rights of survivorship to 50% of [Samaroo's] vested pension benefits." The court stated, however, that whether or not the state court order resulted in any benefits becoming payable to Robichaud under the Plan was a question of federal law over which the federal court had retained jurisdiction and which would have to be resolved by the federal court.

After the state court's ruling, Robichaud and the Plan filed cross motions for summary judgment in the pending federal district court action. The district court examined the statutory requirements for a QDRO under 29 U.S.C. S 1056(d)(3)(C) and(D). The court held that the amended divorce order satisfied the specificity requirements of section 1056(d)(3)(C), but not the substantive requirements of section 1056(d)(3)(D). Under that section a domestic relations order is not a QDRO if it requires the plan to provide any type of benefits not otherwise provided by the plan or to provide increased benefits. 29 U.S.C. S 1056(d)(3)(D)(i) and (ii). The court relied on the reasoning of Hopkins v. AT&T Global Information Solutions Co., 105 F.3d 153, 156 (4th Cir. 1997), to conclude that entitlement to a survivor's annuity in respect of Samaroo had to be determined as of the day Samaroo died, and that the amended divorce decree represented an attempt to obtain increased benefits from the Plan. The court therefore entered summary judgment for the Plan and against Robichaud. Robichaud appeals.

We review a grant of summary judgment de novo, using the same standard the district court must use: summary judgment is proper only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d Cir. 1994).

The district court stated that it would review the Plan's denial of Robichaud's claim under the arbitrary and capricious standard of review appropriate when, as here, a benefit plan gives the plan administrator discretionary authority to construe the terms of the plan. See Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). 29 U.S.C. S 1056(d)(3)(G)(i)(II) requires the plan administrator to make the initial determination of whether an order is a QDRO. However, we conclude that the issue in this case is a question of statutory construction regarding the requisites of a QDRO, rather than a question of interpretation of the Plan. Cf. Hullett, 38 F.3d at 114 (reserving question of whether administrator's finding of QDRO is reviewed de novo). The deferential standard of review of a plan interpretation "is appropriate only when the trust instrument allows the trustee to interpret the instrument and when the trustee has in fact interpreted the instrument." Moench v. Robertson, 62 F.3d 553, 567 (3d Cir. 1995) (emphasis in original) (internal quotation omitted), cert. denied, 516 U.S. 1115 (1996). In this case, there is no dispute about the interpretation of the Plan, but only about whether the nunc pro tunc order qualifies as a QDRO under federal law. We must review legal conclusions and questions of statutory construction de novo. See Dial v. NFL Player Supplemental Disability Plan, 174 F.3d 606, 611 (5th Cir. 1999) (court should review de novo administrator's decision that a property settlement agreement constituted a QDRO, since that involves interpretation of settlement agreement and statutory construction, not interpretation of the plan).

We turn first to the statutory language defining QDROs. Under section 1056(d)(3)(D)

> A domestic relations order meets the requirements of this subparagraph only if such order--

> (i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan, [and]

> (ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value) . . . .

A domestic decree that would have the effect of increasing the liability of the Plan over what has been provided in the Plan (read in light of federal law) is not a QDRO, no matter what the decree's status under state law. The district court held that a decree conferring survivor's benefits on Robichaud after those benefits have lapsed would provide increased benefits and therefore cannot be a QDRO.

The district court relied on the Fourth Circuit's decision in Hopkins, which recognized that defined benefit plans are based on actuarial calculations that would be rendered invalid if participants were allowed to change the operative facts retroactively. In Hopkins a pension plan participant retired and began to draw his pension in the form of a joint and survivor annuity based on the lives of himself and his current wife. Sometime later, his former wife obtained a state court order that she should be treated as the participant's surviving spouse for purposes of the annuity. 105 F.3d at 155. The Fourth Circuit held that this domestic relations order was not a QDRO because the current wife's right to the survivor's benefits vested upon the participant's retirement and could no longer be alienated. Id. at 156-57. The court observed in a footnote that its holding was consistent with actuarial necessity:

> Because the disbursement of plan benefits is based on actuarial computations, the plan administrator must know the life expectancy of the person receiving the Surviving Spouse Benefits to determine the participant's monthly Pension Benefits. As a result, the plan administrator needs to know, on the day the participant retires, to whom the Surviving Spouse Benefit is payable.

105 F.3d at 157 n.7.

Reasoning similar to that in Hopkins was employed in a New Jersey survivor benefits case, Ross v. Ross, 705 A.2d

8

784 (N.J. Super. Ct. App. Div. 1998). There, a couple's divorce decree purported to convey the survivorship rights in the husband's several pension plans to the wife, but as to one plan the decree was not specific enough to be considered a QDRO. Id. at 795. After the divorce, the husband remarried and then died. The first wife attempted to have a QDRO entered after the husband's death to convey the survivorship rights to her. The New Jersey Superior Court, Appellate Division, held that entitlement to survivor's rights was determined as of the day of the participant's death. Id. at 796–97. Under ERISA, the rights could only be conveyed by a QDRO. Because there was no QDRO in place at the time of the participant's death, the first wife could not change the result by obtaining a more specific state court order after the rights had vested in the second wife.

Robichaud argues that by determining the right to benefits as of the day of Samaroo's death, the Plan has cheated Samaroo out of receiving any benefit from participating in the Plan. But actually, successful operation of a defined benefit plan requires that the plan's liabilities be ascertainable as of particular dates. The annuity provisions of a defined benefit plan are a sort of insurance, based on actuarial calculations predicting the future demands on the plan. Some annuity participants will die without ever receiving a payment and some participants will receive payments far in excess of the value of their contributions. The fact that some participants die without a surviving spouse to qualify for benefits is not an unfair forfeiture, as Robichaud contends, but rather part of the ordinary workings of an insurance plan. Allowing the insured to change the operative facts after he has lost the gamble would wreak actuarial havoc on administration of the Plan.3

Besides, it is inaccurate to say that Samaroo was deprived of any benefit from the Plan. Until he died, Samaroo enjoyed the right to remarry and thereby bestow

_____

3. Our holding and opinion are limited to the particular facts before us, and it is not necessary that we reach the broader issue expressed in the dissent's characterization of our holding, infra at 12.

9

on a new wife the survivorship rights under his preretirement annuity. Alternatively, after the enactment of the Retirement Equity Act, he could have entered a QDRO conveying the rights to Robichaud. (But if Samaroo had entered a QDRO making Robichaud his "surviving spouse" under the Plan, he would have lost the right to confer the same survivorship benefits on a new wife. See 29 U.S.C. S 1056 (d)(3)(F) (to the extent QDRO designates former spouse as participant's surviving spouse, current spouse shall not be treated as spouse for purposes of plan)). When Samaroo died without remarrying or naming Robichaud as alternate payee of the survivor's rights, the right to dispose of the benefits lapsed. Allowing Samaroo (or his estate) to preserve the right to confer the benefits on a new wife as long as he was alive and had the possibility of remarrying, and then to designate Robichaud as the surviving spouse after his death, is allowing him to have his cake and eat it, too.

Robichaud urges us to follow an unpublished district court decision, Payne v. GM/UAW Pension Plan, No. 95-CV-73554DT, 1996 WL 943424 (E.D. Mich. May 7, 1996), which is of course not binding on us, both because it is a district court case and because it is unpublished. There, a divorcing couple entered a QDRO specifically denying the wife the right to survivor benefits. After the husband's remarriage and death, the first wife obtained a nunc pro tunc order in the state court giving her the survivorship benefits the husband had withheld when he was alive. The Eastern District of Michigan held that the nunc pro tunc order was effective as a QDRO and that the first wife was entitled to survivor's benefits in accord with that order. Id. at *8.

Far from being persuaded by the reasoning in Payne, we think it provides a telling demonstration of why the order in this case cannot be regarded as a QDRO. In Payne, the husband expressly refused to designate the first wife as his surviving spouse, apparently in view of the fact that he was planning to remarry. After his death (which, incidentally, occurred before he and his new wife had been married long enough for her to qualify for survivor's benefits), the first wife took advantage of his absence to obtain an amended

10

decree giving her the benefits she had not been able to obtain through the divorce negotiations. This is clearly an attempt to expand the pension plan's liability, and the order purporting to accomplish that expansion cannot therefore be recognized as a QDRO under section 1056(d)(3)(D). By holding that the Plan in this case was obligated to recognize the New Jersey court's order in this case as a QDRO, we would make pension plans vulnerable to the sort of abuse shown in Payne.

Finally, Robichaud argues that we must give retroactive effect to the state court amendment of the decree because that decree stated that it was nunc pro tunc. Actually, the state judge recognized that he had power only to affect the legal relation between the Robichaud and the Samaroo estate and that the effect of the amendment on the Plan was a matter of federal ERISA law over which the federal district court had retained jurisdiction when it remanded the divorce case to the state courts. The state court said: "Of course, it will be for the federal court to decide whether or not there were any benefits to be left to Ms. Robichaud." This observation was correct; the effect of the amended decree on the Plan is a matter of federal law which the district court did not remand to the state court. See Samaroo, 743 F. Supp. at 317.

The judgment of the district court is affirmed.

11

MANSMANN, Circuit Judge, dissenting:

Today the majority holds, in effect, that a state court's power to enter or modify a Qualified Domestic Relations Order ("QDRO") with respect to a participant's interest in a pension plan ends with the participant's death. 1 Because I believe that this holding will work an unwarranted interference with the states' ability to administer their domestic relations law and to effectuate equitable divisions of marital assets, I must respectfully dissent.

Initially, I note that the majority's holding is not compelled by anything in the governing Act. The only statutory authority cited by the majority is 29 U.S.C. S 1056(d)(3)(D), which provides that a QDRO cannot require a plan to provide increased benefits. The majority approves the District Court's holding to the effect that "a decree conferring survivors' benefits on Robichaud after those benefits have lapsed would provide increased benefits and therefore cannot be a QDRO." Supra at 12. By assuming that the benefits were conferred after they had lapsed (i.e., after Mr. Samaroo's death), however, it begs the central question whether the state court's entry of its order nunc pro tunc, as of a date before Mr. Samaroo's death, is to be given effect.2

The majority's holding also is not compelled by caselaw. The cases relied on by the District Court and the majority both involved attempts to divest and transfer benefits already vested in a subsequent spouse. See Hopkins v. AT&T Global Informations Solutions Co., 105 F.3d 153 (4th Cir. 1997); Ross v. Ross, 705 A.2d 784 (N.J. Super. App.

_____

1. The majority expressly forecloses a post-death modification of a QDRO which requires "increased benefits." In addition, the Hopkins and Ross cases on which the majority's decision is premised foreclose any shifting of benefits once vested in a particular payee upon a participant's death. See infra 12-13. I am therefore unable to conceive of circumstances in which, under the majority's reasoning, a meaningful alteration of a QDRO could be effected post-death.

2. There appears to be no dispute that if the order had actually been entered on its stated effective date, Ms. Robichaud would be entitled to the survivor's benefit she seeks. There is also no dispute that the Plan did not appeal the state court's decision, making it final.

12

Div. 1998).3 The only case cited by the parties in which benefits had not vested in another holds that the retroactive decree must be given effect. See Payne v. GM/UAW Pension Plan, No. 95-CV-73554-DT, 1996 WL 943424, 1996 U.S. Dist. LEXIS 7966 (E.D. Mich. May 7, 1996).

The majority characterizes the state court's retroactive amendment of a divorce decree in Payne as "abuse", apparently because the husband had refused to grant the requested survivor designation in negotiations while he was alive.4 I am not so ready to presume that a state judge, fully apprised of the facts, possessed of expertise in domestic relations matters, and sworn to uphold the law, has participated in or countenanced abuse. In any event, as discussed below, I believe that we are required to assume that such judicial acts are legitimate.

In rejecting the contention that the state court decree must be given retroactive effect because it stated that it was nunc pro tunc, the majority explains that the effect of the decree on the Plan is a matter of federal law over which the District Court had retained jurisdiction. While I agree that the effect was for the District Court to determine under federal law, I cannot agree with the implicit premise that federal law permits us to disregard the decree's express

_____

3. The Ross holding was premised in part on the Court's observation that "[n]o federal case has allowed a QDRO to be entered after a participant's death." 705 A.2d at 797. However, the (unpublished) Payne case was decided prior to Ross.

4. See supra at 10-11. The majority's opinion reflects an implicit assumption that domestic relations orders merely reflect what the parties have agreed to. Cf. supra at 9-10 (stating that Mr. Samaroo -- rather than the state court -- could have entered a QDRO while he lived, and that his estate -- rather than the state court-- designated Ms. Robichaud as surviving spouse after his death). While it may often work that way in practice, I know of no rule that precludes a state court from ordering relief that one party has refused to accede to in negotiations. On the contrary, although courts in New Jersey will enforce consensual agreements for equitable distribution "if found to be fair and just", they nevertheless retain "the utmost leeway and flexibility in determining what is just and equitable in making allocations of marital assets". Smith v. Smith, 72 N.J. 350, 359-60, 371 A.2d 1 (1977).

13

retroactivity provision. On the contrary, federal law mandates that we give effect to the decree in accordance with its terms.

In my view the question before us -- whether to effectuate the state court's nunc pro tunc order -- is conclusively answered in the affirmative by the Full Faith and Credit Act, which provides that the judicial proceedings of a state court "shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . ." 28 U.S.C. S 1738. We have observed that this section "directs all courts to treat a state court judgment with the same respect that it would receive in the courts of the rendering state", and that we may not "employ [our] own rules . . . in determining the effect of state judgments, but must accept the rules chosen by the State from which the judgment is taken". In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation, 134 F.3d 133, 141-42 (3d Cir. 1998) (quoting Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 373 (1996) (brackets and ellipsis in original; internal quotation marks and citation omitted). These principles apply in determining the effect of a state decree in a federal action. See American Sur. Co. v. Baldwin , 287 U.S. 156, 166 (1932) ("The full faith and credit clause, together with the legislation pursuant thereto, applies to judicial proceedings of a state court drawn into question in an independent proceeding in the federal courts."); Grimes v. Vitalink Communications Corp., 17 F.3d 1553, 1562 (3d Cir. 1994) (holding that Full Faith and Credit Act bars relitigation of issues decided by a state court even as applied to claims over which the state court lacked jurisdiction) (citing Marrese v. American Academy of Orthopaedic Surgeons, 470 U.S. 373, 380-81 (1985).

Because the courts of New Jersey would respect a nunc pro tunc provision in a final judgment, we are required to respect it as well. See, e.g., Fulton v. Fulton, 204 N.J. Super. 544, 549, 499 A.2d 542, 545 (Chanc. Div. 1985) (holding that nunc pro tunc entry of divorce decree would determine surviving spouse status for purpose of intestate distribution); Olen v. Olen, 124 N.J. Super. 373, 307 A.2d 121 (App. Div. 1973) (remanding for amendment of divorce

judgment, nunc pro tunc as of original judgment before wife's death).5

Although I believe the full faith and credit analysis is dispositive, giving effect to the state court's decree also furthers the policy interests at stake. There is good reason to allow state courts some leeway in entering or modifying domestic relations orders even after a participant's death, or retirement, or other status-altering event. The state courts are charged with administering the important, and often complex and volatile, area of domestic relations law.6 The evident purpose of the ERISA's recognition of QDROs is to avoid undue interference with state courts' fulfillment of that charge.7 Imposing a cut-off date by which a state court's orders must be in prescribed form -- a cut-off that does not appear anywhere in the text of ERISA -- would

_____

5. Cf. Ross, 705 A.2d at 797 (reasoning that due to ERISA preemption, "New Jersey's concepts of equity cannot be applied and a QDRO cannot be entered after the fact").

6. See, e.g. Hisquierdo v. Hisquierdo, 439 U.S. 572, 581 (1979) ("The whole subject of domestic relations of husband and wife . . . belongs to the laws of the States and not to the laws of the United States.") (quoting
In re Burrus, 136 U.S. 586, 593-594 (1890)); Brandon v. Travelers Insur. Co., 18 F.3d 1321, 1326 (5th Cir. 1994) (observing in ERISA preemption analysis that "[f]ederal respect for state domestic relations law has a long
and venerable history" and that "[w]hen courts face a potential conflict between state domestic relations law and federal law, the strong presumption is that state law should be given precedence" because "[t]he law of family relations has been a sacrosanct enclave"). Cf. American Telephone and Telegraph Co. v. Merry, 592 F.2d 118, 122 (2nd Cir. 1979) (referring to the "fundamental principle of statutory interpretation (whereby) courts have presumed that the basic police powers of the States, particularly the regulation of domestic relations, are not superseded by federal legislation unless that was the clear and manifest purpose of Congress").

7. As the District Court acknowledged, "Congress' concern that the combination of ERISA preemption and the provisions of REA would lead to unnecessary federal involvement in state domestic relations laws prompted the statutory exemption of [QDROs] from ERISA preemption. Samaroo, 743 F. Supp. 309, 315 (D.N.J. 1990) (citing 29 U.S.C. S 1144(b)(7)).

15

unnecessarily impede those courts' efforts to provide for a just disposition of marital assets.8

There appears to be no strong countervailing policy reason to warrant such interference in this case. I agree that it is important not to upset the actuarial basis of pension plans, but it is hard to believe that the single survivor benefit at issue here is material to the actuarial soundness of a plan with 87,500 participants. Moreover, the Plan does not allege that it reduced funding levels or otherwise changed its position in reliance on a belief that it would not have to pay a surviving spouse benefit with respect to Mr. Samaroo.

Finally, I cannot agree with the majority's contention that designation of Ms. Robichaud as surviving spouse after Mr. Samaroo died without remarrying would allow him to "have his cake and eat it, too"9 because Mr. Samaroo retained the right to confer surviving spouse status on a new wife so

_____

8. Thus, for example, the court in Ross lamented that the "unfortunate result" of its holding (disallowing correction of a QDRO where benefits had vested in a subsequent spouse) was that "equity will not prevail." 705 A.2d at 797.

Post-death (or post-retirement) entry or modification of a decree may reasonably occur in a variety of circumstances, including, e.g., clerical error, appeals, and delays attendant on the formulation of an appropriate order. This is an example of the former: Mr. Samaroo's attorney, who drafted the domestic relations order, testified that, although they did not specifically discuss survivorship benefits, Mr. Samaroo indicated his intent that Ms. Robichaud receive half interest in "everything he had or was entitled to" and that it was only due to the attorney's unfamiliarity with ERISA that the survivor designation was erroneously omitted. See Joint Appendix at 553-54. Counsel also testified that he had no doubt that Mr. Samaroo would have wanted Ms. Robichaud to receive survivorship benefits, see Joint Appendix at 555, and confirmed in a submission to the state court that "the intent of [Mr. Samaroo] at that time was to give this 50 per cent [survivorship] right to his then wife unconditionally and without any contingencies thereto." Joint Appendix at 583. Even if the evidence regarding the scrivener's error is inconclusive, the state court's acceptance of the attorney's word should not be disregarded by a federal court bound to give the state court's determination full faith and credit.

9. Maj. Op. at 10.

16

long as no QDRO designated his former wife as surviving spouse. If the state court's nunc pro tunc order is credited, after its effective date Mr. Samaroo retained the right to accord a new wife surviving spouse status only to the extent of the 50% interest not already granted to Ms. Robichaud.10 Thus, Mr. Samaroo would not have been allowed to have his cake and eat it, too; instead, the law allows the state court to divide the cake equitably and mandates that ERISA plans give effect to that division.

For the foregoing reasons, I would reverse the decision of the District Court and remand with instructions to accord full faith and credit to the state court's retroactive QDRO.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

_____

10. The majority cites 29 U.S.D.C S 1056(d)(3)(F) for the proposition that "if QDRO designates former spouse as participant's surviving spouse, current spouse shall not be treated as spouse for purposes of plan". Id. I do not read the statute to provide such an all-or-nothing choice. Under the statute, a former spouse shall be treated as a surviving spouse, and a subsequent spouse shall not be so treated, only"[t]o the extent provided" in a QDRO. 29 U.S.C. S 1056(d)(3)(F). Here, the "extent provided" is 50%. The REA expressly recognizes the right to make such partial designations. See 29 U.S.C. S 1056(d)(3)(B)(i)(I) (defining QDRO as order which, inter alia, recognizes or assigns right to receive "all or a portion" of benefits under a plan). A natural reading would call for treating Ms. Robichaud as surviving spouse to the extent of 50% of the applicable benefit, and treating a new wife (if any) as spouse only to the extent of the remaining 50%.

17