Barbara A. PATTON f/k/a Barbara
A. Phipers, Plaintiff,

v.

The DENVER POST CORPORATION
and The Denver Post–Denver Guild
Pension Plan, Defendants.

No. CIV.A.00–K–1860.

United States District Court,
D. Colorado.

Jan. 3, 2002.

Mary J. Kelly, Mary J. Kelly, Atty, Daniel S. Hoffman, Hoffman, Reilly, Pozner & Williamson, L.L.P., Denver, CO, for plaintiff.

Mary Hurley Stuart, Holme Roberts & Owen LLP, United States District Court, Denver, CO, for defendants.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

This ERISA declaratory judgment action is before me on cross-motions for summary judgment. In a question of first impression in this circuit, Plaintiff seeks a declaration that a state domestic relations order granting her survivor benefits in her former husband's pension plan, entered after the husband's death but *nunc pro tunc* to the date of their divorce, was a "qualified domestic relations order" (QDRO) under ERISA § 306(d)(3), 29 U.S.C. § 1056(d)(3). Relying on the majority's decision in *Samaroo v. Samaroo,* 193 F.3d 185 (3d Cir.1999), Defendant Plan argues it was not because any order purporting to confer pension benefits to a non-participant after those benefits lapsed upon the participant's death would require the Plan to provide "increased" benefits beyond the scope of a QDRO under § 1056(d)(3)(D). Relying on *Samaroo's* dissent, Plaintiff invokes the Full Faith and Credit Act, 28 U.S.C. § 1738, to argue the *nunc pro tunc* aspect of the state court's order should be effectuated—i.e., if the effect of the *nunc pro tunc* order was to make the transfer of benefits effective *before* Phipers's death, then nothing in ERISA precludes that order from being a QDRO. Under the specific facts of this case, I agree with Plaintiff.

## I. FACTS AND PROCEDURAL HISTORY.

Plaintiff Barbara Patton is the former wife of deceased Denver Post employee William Todd Phipers. Phipers participated in two retirement plans during the course of his employment with the Post, but disclosed only his Newspaper Guild

International Pension Fund (the "Disclosed Plan") to Patton in their 1988 divorce settlement. A Denver Newspaper Guild Pension Plan (the "Second Plan") went undisclosed and was omitted from the divorce negotiations and settlement entirely.

As part of the division of assets set forth in the Separation Agreement incorporated as part of the parties' divorce decree, Phipers designated Patton as an alternate payee of the Disclosed Plan entitled to a one-half interest in that portion of it attributable to their 13 years of marriage. Separation Agreement, § IV, ¶ f (attached as Ex. C to Pl.'s Mot. Summ. J.). Patton's interest was defined in an order entitled "Qualified Domestic Relations Order" attached to the Separation Agreement, which was signed as an order of the court on September 9, 1988. QDRO (attached as Ex. D to Pl.'s Mot. Summ. J.).

Todd Phipers died in early 1999 from cancer. In her capacity as Phipers's personal representative after his death, Patton came across the Second Plan and discovered Phipers had actually participated in two pension plans during his tenure at the Post. Believing the omission of the Second Plan in the division of assets to have been inadvertent, Patton filed a motion in her domestic relations case for entry of a second QDRO to correct the mistake. Mot. for Entry of Nunc Pro Tunc QDRO for Omitted Plan (Ex. I, Pl.'s Mot. Summ. J.). The Motion explicitly requested entry of the order *nunc pro tunc* to a date before Phipers's death to meet the requirements of ERISA. *See* Motion, ¶ 11.

The domestic relations judge granted the motion and entered a second "Qualified Domestic Relations Order" on December 17, 1999 (the "1999 Order"), giving Patton the same one-half interest in the omitted plan as Phipers had given her in the first. The 1999 Order was entered *nunc pro tunc* to February 10, 1988, the day after the parties' divorce was final and 11 years before Phipers' death, and was specifically "intended to constitute a Qualified Domestic Relations Order (QDRO) under Section 414(p) of the [Internal Revenue] Code and Section 206(d) of ERISA." 1999 QDRO, ¶ 1 (Ex. H to Pl.'s Mot. Summ. J.).

The Plan Administrator refused to recognize the Order as a QDRO on grounds that it was entered after Phipers's death. *See* 5/26/00 Letter from Green to Patton (Ex. E, Pl.'s Mot. Summ. J.). Without explaining how the declaration applied in Patton's case, the Administrator stated that "the Internal Revenue Code (in section 414(p)(3)(B)) and ERISA (in section 306(d)(3)(D)(ii)) both provide that a qualified domestic relations order cannot require the plan to pay increased benefits." *Id.* at p. 1. This action ensued.

## II. DISCUSSION.

Summary judgment is appropriate if the evidence presented by the parties demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The question to be decided is whether the December 1999 *nunc pro tunc* Order is a "qualified domestic relations order" within the meaning of 29 U.S.C. § 1056(d)(3), such that Patton is entitled to surviving spouse benefits in the Second Plan.[1] The

---

**1.** I reject at the outset Patton's assertion that the 1999 Order is entitled to preclusive effect as an ERISA-qualified QDRO by operation of the Full Faith and Credit Act, 28 U.S.C. § 1739, because the question of whether the Order was "qualified" for purposes of ERISA was not decided, nor even addressed, by the state court judge. *See Hawkins v. Comm'r of Internal Revenue,* 86 F.3d 982, 987 (10th Cir.1996)(divorce court judgment did not pre-

Post and Plan Administrator contend the funds Phipers contributed to the Second Plan before his death reverted back to the Plan when he died without a surviving spouse on February 10, 1999, and cannot be revived by entry of any order after his death without running afoul of ERISA's requirement that a "qualified" DRO may not compel a plan to provide "increased" benefits.

Under ERISA, retirement benefits may not generally be assigned or alienated by a plan participant. 29 U.S.C. § 1056(d)(1). An exception to the general rule is recognized, however, where the assignment or alienation is achieved in a "qualified" domestic relations order. *Id.*, § 1056(d)(3)(A). While any state court order conveying pension plan benefits to someone other than the plan participant in divorce proceedings meets the definition of a "domestic relations order" under

ERISA, 29 U.S.C. § 1056(d)(3)(B)(ii), it will not be recognized as a "qualified domestic relations order" if it (i) requires a plan to provide a "type or form of benefit ... not otherwise provided under the plan"; (ii) requires the plan to provide "increased benefits (determined on the basis of actuarial value)"; or (iii) "requires the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order." § 1056(d)(3)(D).

Defendants here invoke the first and second proscriptions in § 1056(d)(3)(D) to argue the Order is not a "qualified" DRO for purposes of the exception to the nonalienability of pension benefits under ERISA. Specifically, Defendants argue that "a post-mortem domestic relations order which purports to require payment to a newly-designated, post-mortem 'surviv-

clude litigation of QDRO on grounds that QDRO was entitled to full faith and credit because precise statutory question of whether marital settlement agreement was QDRO "was neither actually litigated nor necessarily decided" in the divorce proceedings). *C.f. Jones v. American Airlines*, 57 F.Supp.2d 1224, 1232 (D.Wyo.1999)(where state divorce court made specific finding that QDRO and amended QDRO were "qualified domestic relations orders" within the meaning of 29 U.S.C. § 1056, federal court would give full faith and credit to them). Indeed, both the Separation Agreement and the QDRO at issue contemplated that a determination of "qualification" would have to be made by the Plan Administrator before its effect as a QDRO would be operative. *See* Separation Agreement, ¶ 4.2(f)("[T]he Qualified Domestic Relations Order must be approved by the pension plan administrators before it is effective"); 1999 QDRO at ¶ 8 ("following a determination by the Plan Administrator that this Order is a QDRO ... the Alternate Payee may elect to commence benefit payments"). The Plan, moreover, was not a party to the Motion for Nunc Pro Tunc order proceedings and would not be bound by the ruling on that Motion under Colorado law in any event.

In addition, I reject Defendants' suggestion that I lack jurisdiction to consider the validity of Judge Egelhoff's order under the *Rooker–Feldman* doctrine, which prohibits federal trial courts generally from reviewing final state court decisions. *See District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416, 44 S.Ct. 149, 68 L.Ed. 362 (1923). Where the purpose of a federal action is "separable from and collateral to" the state court judgment, the *Rooker–Feldman* doctrine does not apply. *Kiowa Indian Tribe v. Hoover*, 150 F.3d 1163, 1169–70 (10th Cir.1998). Here, I am called upon not to review the legal determinations made by Judge Egelhoff at the state level, but to decide a federal issue not part of those determinations, namely, whether the state *nunc pro tunc* order is a QDRO under ERISA. The underlying state decision will not be undermined regardless of how I rule, because the DRO was not intended to be effective until a determination, either by the plan administrator or a federal district court judge, that the DRO is "qualified." Accordingly, subject matter jurisdiction exists in this court.

ing spouse' violates ERISA by seeking to expand the liability of the plan by reviving obligations that had ended." Defs.' Br. in Supp. of Mot. Summ. J. at p. 7.

The positions of both sides are set forth in the Third Circuit's decision in *Samaroo v. Samaroo*, 193 F.3d 185 (3d Cir.1999): Defendant Plan invokes the *Samaroo* majority opinion and Patton's arguments reflect the dissent. The majority characterized the question of whether a state *nunc pro tunc* order is a QDRO as one of statutory construction under ERISA, concluding the state court order at issue did not qualify as a QDRO under federal law. Citing New Jersey cases for the proposition that entitlement to survivor's rights is determined as of the day of the participant's death, the majority reasoned that the plan benefits lapsed when the participant died, such that an order later conferring such benefits on a survivor would run afoul of § 1056(d)(3)(D)(ii) by "increasing" plan liability (from zero). *Id.* at 189–90. The court rationalized this result by reflecting on the actuarial nature of pension plans generally:

> Successful operation of a defined benefit plan requires that the plan's liability be ascertainable as of particular dates. The annuity provisions of a defined benefit plan are a sort of insurance, based on actuarial calculations predicting the future demands on the plan. Some annuity participants will die without ever receiving a payment and some participants will receive payments far in excess of the value of their contributions. The fact that some participants die without a surviving spouse to qualify for benefits is not an unfair forfeiture, as [plaintiff] contends, but rather part of the ordinary workings of an insurance plan. Allowing the insured [or his representative] to change the operative facts after [the insured] has lost the gamble would wreak actuarial havoc on administration of the Plan.

193 F.3d at 190. Defendants rely on the majority's reasoning to argue the 1999 Order was not a QDRO for purposes of ERISA.

Plaintiff denies the ERISA statute compels the conclusion reached by the majority in *Samaroo* and invokes Judge Mansmann's dissent to argue the state divorce court's *nunc pro tunc* order should be given effect. As Judge Mansmann recognized, when one gives a *nunc pro tunc* order its stated effect under state law under the instant circumstances, there *was* no death without a surviving spouse (under Colorado law recognizing the validity of orders *nunc pro tunc*, Patton was the designated beneficiary of Phipers's interest in the omitted plan eleven years before his death) and, therefore, no order compelling "increased" benefits under the Plan.

As I see it, the question before me is whether ERISA precludes, or renders invalid as Defendants seem to suggest, a state domestic relations court's attempt, pursuant to its continuing jurisdiction in a domestic relations case, to correct an omission of pension benefits in a previously entered divorce decree after the plan participant dies. In this regard, Defendants do not argue the *nunc pro tunc* order was entered erroneously or that it was beyond the scope of the domestic relations judge's authority under Colorado law to issue. Instead they simply assert, on the authority of the *Samaroo* decision only and without any analysis of ERISA's QDRO provisions, that the *nunc pro tunc* order at issue would have the effect of increasing the liability of the Plan. As Judge Mansmann observed in his dissent, the assertion "begs the central question whether the state court's entry of its order *nunc pro tunc*, as of a date before [the plan participant's]

death, is to be given effect." *Samaroo,* 193 F.3d at 192.

In his dissent in *Samaroo,* Judge Mansmann observed that while the effect of a state court order on an ERISA plan administrator is a question of federal law under the statute, he could not agree with the premise implicit in the majority's analysis that federal law requires us to disregard an express retroactivity provision set forth in such an order. *Samaroo,* 193 F.3d at 193. The question of whether to effectuate a state court's *nunc pro tunc* order, he determined, "is conclusively answered in the affirmative by the Full Faith and Credit Act, which provides that the judicial proceedings of a state court 'shall have the same full faith and credit in every court within the United States .. as they have by law or usage in the courts of such State ....' " *Id.* (citing 28 U.S.C. § 1738). Under the narrow circumstances of this case,[2] I agree. The question, then, is the extent to which Colorado courts would give effect to the *nunc pro tunc* order at issue in this case.

■■ *Nunc pro tunc* orders may be entered by a Colorado court to correct an error or omission in court records and are deemed to have retroactive effect. *Fasi v. Becker,* 32 P.3d 557, 559 (Colo.App.2000)(citing *Perdew v. Perdew,* 99 Colo. 544, 64 P.2d 602 (1936) and *Black's Law Dictionary* 1097 (7th ed.1999))(rejecting wife's claim that she was never legally married to her deceased husband because *nunc pro tunc* decree dissolving his previous marriage had not been entered at the time of their wedding), *cert. granted on other grounds,* Oct. 15, 2001. In domestic relations cases in particular, trial courts have discretion to enter *nunc pro tunc* orders and those orders may not be impeached collaterally. *Id.* (citing *Diebold v. Diebold,* 79 Colo. 7, 243 P. 630 (1926)).

This is so even in the case of postmortem orders entered *nunc pro tunc* to a date before the affected party's death. In *In re Marriage of Rose,* 40 Colo.App. 176, 574 P.2d 112, 113 (1977), for example, the Colorado Court of Appeals upheld the validity of a *nunc pro tunc* divorce decree entered after the husband's death where the effect of the order was to deny wife benefits as the surviving spouse in the husband's estate. The husband died after a decree of divorce had been issued verbally at the parties' dissolution hearing, but before the parties' proposals regarding a final division of assets had been received. The wife claimed she should be considered the surviving spouse notwithstanding the later entry of a decree of dissolution because, at the time of her husband's death, the court's request for proposals was pending and no valid or final divorce decree had been issued. *Id.* The Court of Appeals disagreed, upholding the trial court's action where there was no evidence suggesting the intent of the parties at the date of the hearing was not to divorce and where the trial court's actions were in keeping with the purposes of the dissolution statute and the parties' overall best interests. *Id.*

■ Applying Colorado law to the 1999 Order at issue, I conclude Colorado courts would give it its *nunc pro tunc* effect. The Order was entered pursuant to the domestic relations court's continuing juris-

---

**2.** Here I note there are no competing claims to the fund proceeds at issue—there is no competing "alternate payee," the Plan has made no payments to anyone else, and recognizing the *nunc pro tunc* effect of the 1999 Order divests no one of any rights to or interest in any benefits of the Plan. I do not address the situation that would exist if Phipers had remarried, for example, such that a second wife could claim an interest in the omitted plan as surviving spouse.

diction over the Patton–Phipers divorce to correct an inadvertent omission· of assets in the parties' Separation Agreement and divorce decree adopting it. There is no suggestion the trial court abused its discretion in issuing the Order and its validity under the *Perdew* standard for *nunc pro tunc* orders has never been challenged. State courts are presumed to know and apply their states' laws correctly, and in the absence of any legal authority to the contrary, I will presume the 1999 Order in the instant case was entered appropriately.[3]

Defendants' arguments to the contrary notwithstanding, there is nothing in the ERISA statute that compels the invalidation of the *nunc pro tunc* order at issue. The only statutory authority cited by the Plan is 29 U.S.C. § 1056(d)(3)(D)(ii), which provides that a QDRO cannot require a plan to provide increased benefits. Where no one else has received or has an interest in survivor benefits under Phipers's omitted Second Plan, giving the 1999 Order its retrospective effect would compel no "increase" in benefits as would render the

QDRO ineffective under ERISA. The only caselaw ·offered in support of Defendants' argument is *Samaroo*, which, I have already stated, rests on an analysis that simply begs the question of whether to effectuate an otherwise valid state *nunc pro tunc* order, and the two cases cited by the *Samaroo* majority in support of that analysis. I find neither of those cases persuasive.[4]

Giving the 1999 Order its *nunc pro tunc* effect preserves its status as a QDRO under ERISA. The only way to conclude otherwise is to hold that ERISA precludes state courts from exercising their authority to grant retrospective relief in a domestic relations case for the purpose of correcting the inadvertent omission of assets in divorce proceedings once the ERISA-qualified plan participant dies. There is nothing in the ERISA statute or its legislative history compelling such a holding,[5] and I agree with Judge Mansmann that there are significant policy reasons not so to hold.

---

3. Had the pension funds at issue already vested in or been received by another at the time of the 1999 Order, its *nunc pro tunc* provisions would have likely run afoul of the *Perdew* standard and rendered it subject to collateral attack. That scenario is not before me today, and I am bound to give the 1999 Order's presumptively valid *nunc pro tunc* provision its proper effect under state law.

4. In *Hopkins v. AT & T Global Info. Solutions, Co.*, 105 F.3d 153 (4th Cir.1997), for example, the first wife of a plan participant sought to "qualify" a domestic relations order entered after the plan participant's death that would have had the effect of divesting benefits that had already vested in the participant's second wife. Similarly in *Ross v. Ross*, 308 N.J.Super. 132, 705 A.2d 784 (1998), a domestic relations order obtained by the participant's first wife was deemed not "qualified" for purposes of ERISA because it would have had the effect of divesting the second wife's right to survivor benefits, which vested upon the

plan participant's retirement. Here, no benefits have been conferred to any other "alternate payee" under ERISA and, if unclaimed, would merely revert to the coffers of the Denver Post as employer.

5. Neither the anti-alienation provisions of ERISA nor its REA amendments prohibit state domestic relations courts from issuing *nunc pro tunc* orders or from otherwise effecting retrospective relief in the division of marital assets. In a "'fundamental principle of statutory interpretation,'" courts presume "'the basic police powers of the States, particularly the regulation of domestic relations, are not superseded by federal legislation unless that was the clear and manifest purpose of Congress.'" *Samaroo*, 193 F.3d at 193 (Mansmann, J. dissenting)(quoting *American Telephone & Telegraph Co. v. Merry*, 592 F.2d 118, 122 (2nd Cir.1979))(giving effect to state garnishment statute affecting ERISA-governed pension benefits).

Correcting the effect of the Second Plan's inadvertent omission was clearly the intent of the domestic relations judge in this case in granting Patton's Motion for Nunc Pro Tunc Order. To limit its ability to effectuate that intent when ERISA does not expressly require it would unnecessarily inject this court into a state domestic relations proceeding with which it is wholly unfamiliar. The state domestic relations judge was familiar with both parties before Mr. Phipers's death, approved their Settlement Agreement and issued a previous QDRO giving Patton her interest in the only pension plan identified at the time of the parties' divorce.

Under these circumstances, I will not second-guess that court's determination that the later-discovered Second Plan was inadvertently omitted and will not prohibit, by adopting a dubious principle of federal common law, state court judges from exercising their *nunc pro tunc* authority to correct such omissions in the future. I agree with Judge Mansmann that state courts should be given leeway in entering or modifying domestic relations orders. *Samaroo*, 193 F.3d at 193. "State courts are charged with administering the important, and often complex and volatile, area of domestic relations law." *Id.* (citing *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 581, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979)(subject of domestic relations of husband and wife " 'belongs to the laws of the States and not to the laws of the United States' ") (citation omitted)).

### III.  CONCLUSION.

My charge in this case is either to give an otherwise valid state domestic relations court order its stated *nunc pro tunc* effect or to hold that ERISA preempts state law in this regard and prohibits the exercise of *nunc pro tunc* authority upon the death of an ERISA-qualified plan participant. I decline to do the latter. ERISA does not compel such a conclusion and I see no legitimate federal policy reason for circumscribing state domestic relations courts' authority in this regard. To the contrary, there are strong policy reasons to leave the state domestic relations courts' discretionary authority to determine and effectuate the intent of husbands and wives in divorce intact under the specific facts of the cases before them. Any concern that state courts will abuse that authority by issuing improper *nunc pro tunc* orders is unfounded. The circumstances under which orders *nunc pro tunc* may be entered under Colorado law are narrow, *see Perdew*, and divorce courts will continue to be bound by the standards articulated therein. My holding, moreover, is limited to the circumstances presented here, namely, no proceeds from the omitted Plan have been disbursed nor a competing "alternate payee" identified.

Based on the foregoing, IT IS ORDERED that Plaintiff's Motion for Summary Judgment is GRANTED and Defendants' Motion for Summary Judgment is DENIED. The state domestic relations court's 1999 Order is deemed a valid QDRO under ERISA such that the Plan Administrator must recognize Patton's interest as a surviving spouse in the proceeds of the omitted Second Plan as set forth in that Order.